

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. AP-77,053
---

### ERIC LYLE WILLIAMS, Appellant

### v.

### THE STATE OF TEXAS

---
### ON DIRECT APPEAL FROM CAUSE NO. 32021-422
### IN THE 422ND DISTRICT COURT
### KAUFMAN COUNTY
---

**KEASLER, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In December 2014, a jury convicted Williams of capital murder.[1] Pursuant to the

jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article

---

[1] TEX. PENAL CODE § 19.03(a)(2), (7).

37.071, sections 2(b) and 2(e), the trial judge sentenced Williams to death.[2] Direct appeal

to this Court is automatic.[3] After reviewing Williams's forty points of error, we find them

to be without merit. Consequently, we affirm the trial court's judgment and sentence of

death.

In his twenty-second and fortieth points of error, Williams challenges the sufficiency

of the evidence to support his conviction and the jury's affirmative answer to the future

dangerousness special issue. We will address these claims first. The remaining points of

error will be addressed in the order presented in Williams's appellate brief.

SUFFICIENCY OF THE EVIDENCE: GUILT/INNOCENCE

In point of error twenty-two, Williams argues that the evidence is legally insufficient

to support his conviction for capital murder. Williams asserts that the evidence is legally

insufficient because there was no proof of a burglary, in that there was no evidence of a

forced entry or an entry by deception into the McLellands' home. Additionally, he argues

that none of the State's witnesses at the guilt phase placed him at the scene of the murder or

heard him threaten to kill the McLellands. Williams further asserts that he was linked to the

McLelland murders by no direct evidence and by very little circumstantial evidence. He

argues that the State did not prove either of its capital murder theories—murder in the course

of committing burglary or multiple murders—beyond a reasonable doubt. He reasons that

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g). Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

[3] Art. 37.071, § 2(h).

there was no proof that he shot and killed anyone because the "forensics and physical evidence" did not point to a specific person. Rather, Williams asserts, the State's evidence pointed to a storage unit to which he did not have exclusive access.

Williams also asserts that the State's forensic computer data did not prove that he sent any of the messages attributed to him by the State. In addition, he notes that there was no evidence of calls, texts, or e-mail sent from the cellular telephones that were seized from him during the investigation. He also points out that there was no tracking data from those phones that connected them to the offense.

*Analysis*

In assessing the legal sufficiency of the evidence to support a capital murder conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt.[4] "The reviewing court must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"[5] Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is

---

[4] *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

[5] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)).

sufficient to support the conviction.[6]

The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.[7] A lack of direct evidence is not necessarily dispositive of the issue of guilt.[8] This is especially so when the defendant takes steps to eliminate witnesses and conceal other forms of evidence.[9] Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient.[10] On appeal, we use the same standard of review for both circumstantial and direct evidence cases.[11]

The law provides that a person commits murder when he intentionally or knowingly causes the death of an individual.[12] It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range

---

[6] *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

[7] *Gardner*, 306 S.W.3d at 285.

[8] *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

[9] *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (noting that attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are circumstances indicative of guilt).

[10] *Id.*

[11] *Hooper*, 214 S.W.3d at 13.

[12] TEX. PENAL CODE § 19.03(a)(2); *see Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016), *cert. denied*, 85 U.S.L.W. 3409 (Feb. 27, 2017).

demonstrates an intent to kill.[13]

In this case, the trial judge instructed jurors that, if they believed from the evidence beyond a reasonable doubt that, on or about March 30, 2013, Williams "did then and there intentionally cause the death of an individual, Cynthia McLelland, by shooting her with a firearm, in the course of attempting to commit or committing burglary of a habitation of Cynthia McLelland," or if they believed from the evidence beyond a reasonable doubt that Williams "did then and there murder more than one person during the same criminal transaction, to wit: intentionally or knowingly cause the death of an individual, Michael McLelland, by shooting him with a firearm," and "intentionally or knowingly cause the death of another individual, Cynthia McLelland, by shooting her with a firearm," then the jury would find Williams guilty of capital murder as charged in the indictment. The jury found Williams guilty of capital murder "as charged in the indictment."

The trial judge's charge authorized the jury to convict on alternative theories. We will uphold the verdict of guilt if the evidence was sufficient on either theory.[14] Contrary to Williams's position, we need not consider whether the State proved the underlying felony of burglary because the State presented ample evidence proving that Williams intentionally or knowingly murdered more than one person during the same criminal transaction.

Viewed in the light most favorable to the verdict, the evidence showed that the

---

[13] *Balderas*, 517 S.W.3d at 766-67 (citing *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005)).

[14] *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

McLellands went to bed in their home on Friday night. On Saturday morning, they were awakened by their murderer. The perpetrator was in their home for less than two minutes. The severity and number of the McLellands' injuries left no room for doubt concerning the perpetrator's intent to kill the couple.[15] Using high-velocity ammunition, the perpetrator shot Cynthia between five and eight times, including several shots to her chest and abdomen. After Cynthia had fallen to the floor, the perpetrator fired a shot that entered the top of her head and exited under her chin. Additionally, the perpetrator shot Michael at least ten times, including several shots to his neck, chest, and abdomen. Some of these shots were fired after Michael was lying on the floor. The State's evidence proved beyond a reasonable doubt that the perpetrator intentionally or knowingly caused the deaths of two people during the same transaction.[16]

The State's evidence proved that Williams had a motive and the opportunity to kill Michael McLelland. "Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt."[17] The jury learned that Williams had been part of the legal community of Kaufman County since the early 1990s, when he began working as a coordinator for the 86th District Court. He had also worked or volunteered in law enforcement. In 1999 or 2000, Williams obtained a law degree

---

[15] *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (noting that intent can be inferred from, among other factors, the extent of the victim's injuries).

[16] *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(7)(A).

[17] *Temple v. State,* 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

and began practicing law in Kaufman. He became active in the Texas State Guard in 2008. He was elected as a Justice of the Peace and took office in January 2011.

The jury further learned that, in June 2011, Williams was arrested for a felony offense. Kaufman County's elected District Attorney, Michael McLelland, represented the State in that matter. Following a March 2012 jury trial resulting in conviction, Williams was suspended from the practice of law, discharged from the Texas State Guard, and removed from elected office. As a result of that felony conviction, Williams lost his elected office, his law practice, and his Texas State Guard post. Less than four months before the murders, Williams confided to an acquaintance that he was having money problems and that he was "at the end of his rope." Williams also expressed the view that the prosecution against him had been unfair.

Before his felony conviction, Williams was known to his friends and acquaintances as a firearms "buff" who owned a number of firearms. After his felony conviction, he falsely informed an acquaintance and law enforcement officials that he had gotten rid of his firearms. Williams also asked an acquaintance to help him get rid of an assault rifle "upper receiver," stating that he wanted to "make sure [the upper receiver] never sees the light of day." Using an assumed name, Williams paid cash for a retired police car, a white Crown Victoria. After he bought the Crown Victoria, Williams continued using his Sport Trac as his personal vehicle. Williams's conduct before the murders indicated that he was planning

something that he wanted to keep secret.[18]

Less than three months before the offense, Williams lied to his friend Sergeant Major Barton "Rodger" Williams to persuade him to rent a storage unit—"Unit 18"—that was about the size of a one-car garage. Williams's home in Kaufman was approximately twenty miles south of the McLellands' home in Forney. The storage unit in Seagoville was roughly fifteen miles northwest of Kaufman and approximately fifteen miles southwest of the McLellands' home.

The storage facility opened at 6:00 a.m. daily. So on Saturday, March 30, Williams had the opportunity to drive to the storage unit, exchange his black Sports Trac for the Crown Victoria, and retrieve a weapon and ammunition around 6:00 a.m.; drive to the McLellands' home and murder them around 6:40 a.m.; return to the storage unit, exchange the Crown Victoria for his Sports Trac, and leave the car, weapon, and ammunition in the storage unit; and then return to his home in Kaufman. Security video confirmed that, at the relevant times, a black Sports Trac and a light-colored Crown Victoria entered and exited the storage facility. The security camera captured no other vehicles entering or leaving the storage facility during those times. Approximately two weeks after the instant offense, the Crown Victoria, multiple firearms, ammunition, and a ballistics vest and sheriff's patch were recovered from the storage unit.

Evidence showed that Williams lied to police about the number of weapons and cell

---

[18] *See Guevara*, 152 S.W.3d at 50 ("Intent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant.").

phones he owned and whether he had conducted online searches for information about McLelland. The GSR testing results were inconsistent with William's statements that he had not fired a gun in months. And evidence found in Williams's home linked him to the tips provided to Crime Stoppers regarding the criminal conduct.

The State presented evidence that messages had been sent from Williams's computer and user profile using The Onion Router ("TOR") network and that Crime Stoppers had received threatening messages from the TOR network. Crime Stoppers had received a threatening message from the TOR network several minutes after a message was sent from Williams's computer using the TOR browser, which was consistent with the message to Crime Stoppers having come from Williams's computer. The State also presented evidence that someone in Williams's home had written down unique identifying alphanumeric sequences that were generated by TipSubmit and associated with those threatening messages. The jury could infer from this evidence that Williams had sent the threatening messages to Crime Stoppers and that he had used the TOR network in an attempt to prevent law enforcement officials from tracing the messages back to him.

Additionally, evidence found in the storage unit linked Williams to the murder weapon. Williams's fingerprints were found on the Crown Victoria and on one of the weapons recovered from Unit 18. Although the assault-rifle upper receiver that fired the bullets that killed the McLellands was never recovered, ballistics examination revealed that the bullets that killed the McLellands were fired from the same upper receiver that had chambered a live round recovered from a bag in Unit 18. Some fired bullets recovered from

underneath a bridge between Kaufman and Seagoville were also found to have been fired from that upper receiver. This evidence suggested that the same person who killed the McLellands had accessed Unit 18 and had used the area under the bridge to practice shooting the murder weapon.

Williams also argues on appeal that the State did not prove that he was the perpetrator because Williams's wife Kim and his friend Rodger had access to Unit 18. However, "[f]or the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt."[19] We will not usurp the role of the factfinder by factoring into our sufficiency analysis an alternative hypothesis inconsistent with Williams's guilt.[20]

Williams complains that the State did not prove that he sent the electronic messages to Crime Stoppers. He also complains that the State offered no cell phone tracking data or cell phone communications linking him to the offense. Again, however, the State was not required to disprove every alternative hypothesis inconsistent with Williams's guilt. In this light, the lack of cell phone tracking data or cell phone communications linking Williams to the offense is not ultimately fatal. The State's evidence demonstrated that Williams took measures to avoid leaving evidence that could link him to the offense. The fact that he was

---

[19] *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

[20] *See Jenkins v. State*, 493 S.W.3d 583, 601 (Tex. Crim. App. 2016).

partially successful does not mean that the State's evidence was insufficient.[21]  Ultimately, any lack of direct evidence in the State's case is attributable to Williams's calculated decision to execute the only witness who could have provided direct evidence of guilt.  And the jury could reasonably infer from the ample circumstantial evidence that Williams was guilty of capital murder.  Point of error twenty-two is overruled.

### SUFFICIENCY OF THE EVIDENCE:  PUNISHMENT

In point of error forty, Williams asserts that the evidence is legally insufficient to support the jury's affirmative answer to the future dangerousness special issue.  Williams asserts that the evidence is legally insufficient to show his future dangerousness because he had no prior violent offense convictions and defense witnesses testified that he "essentially was a low risk of future dangerousness while incarcerated."  Williams urges that, before these "isolated and factually connected incidents," he lived "a good, normal, law-abiding life of practicing law, taking court appointments, and helping people in the Court system."  He also asserts that he diligently discharged his duties as a justice of the peace.

Williams also notes that, while he was in custody in Kaufman and Rockwall Counties, he was "compliant with institutional authorities."  He asserts that he had no disciplinary infractions or negative interactions with law enforcement officials.  Williams points out that both the State and the defense presented evidence that the instant offenses were motivated by a desire for revenge against "a few politicians who ruined his life," and not by any broader

---

[21]  *See Evans v. State*, 202 S.W.3d 158, 166 (Tex. Crim. App. 2006) ("It is the logical force of the circumstantial evidence, not the number of links, that supports a jury's verdict.").

impulse toward violence against society in general. Appellant argues that the circumstances that motivated him to commit these offenses would not exist in prison, and therefore he would not be a future danger if sentenced to life in prison.

*Analysis*

When reviewing the sufficiency of the evidence supporting the jury's future dangerousness determination, we view the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found beyond a reasonable doubt that there is a probability that an appellant would commit criminal acts of violence constituting a continuing threat to society.[22] The future dangerousness special issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration.[23] Further, we do not weigh the evidence of future dangerousness against countervailing evidence.[24]

In determining the special issues, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial.[25] The jury may consider a variety

---

[22] *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *see also Wardrip v. State*, 56 S.W.3d 588, 593 (Tex. Crim. App. 2001).

[23] *Coble v. State*, 330 S.W.3d 253, 269 (Tex. Crim. App. 2010).

[24] *See Brooks v. State*, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) ("[A] reviewing court is required to defer to a jury's credibility and weight determinations."); *see also McGinn v. State*, 961 S.W.2d 161, 168-69 (Tex. Crim. App. 1998) (stating that, once the rationality of the future dangerousness prediction is established, it is impossible to determine whether the prediction is nevertheless wrong or unjust because of countervailing evidence).

[25] Art. 37.071, § 2(d)(1); *see also Young v. State*, 283 S.W.3d 854, 863 (Tex. Crim.
(continued...)

of factors when determining whether a defendant will pose a continuing threat to society.[26]

The circumstances of an offense alone, if severe enough, can be sufficient to sustain an affirmative finding as to a defendant's future dangerousness.[27] "[T]his Court has repeatedly said that, if the circumstances of the case are sufficiently cold-blooded or calculated, then those facts alone may support a finding of future dangerousness."[28]

The State presented evidence at punishment that Williams had committed another murder before he killed the McLellands. Specifically, on the morning of January 31, 2013, Williams murdered Mark Hasse, the assistant district attorney who helped McLelland prosecute Williams's 2012 theft and burglary case. In preparation for the offense, Williams researched Hasse's home address and surveilled Hasse's neighborhood. He purchased a Mercury Sable that he found in an online advertisement and used it to travel to and from the scene of the murder.

Wearing a tactical vest, a black mask, and army boots, and carrying two handguns, Williams confronted Hasse on the sidewalk in front of the courthouse as Hasse was walking to his office. After a brief encounter during which Williams shoved Hasse and Hasse cried,

---

[25](...continued)
App. 2009).

[26] *Wardrip*, 56 S.W.3d at 594 & n.7; *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[27] *See Rosales v. State*, 841 S.W.2d 368, 381 (Tex. Crim. App. 1992); *see also Kunkle v. State*, 771 S.W.2d 435, 445-46 (Tex. Crim. App. 1986).

[28] *Gardner*, 306 S.W.3d at 304.

"I'm sorry, I'm sorry," Williams shot Hasse four or five times with one handgun. He fired several of these shots after Hasse was lying on the sidewalk. After emptying that gun, Williams pulled out a second handgun and continued firing at Hasse. He also fired shots into the air as he walked away from Hasse. He then climbed into the Sable and drove away.

The evidence that Williams planned and executed the murders of three people in two separate incidents supports the jury's finding of future dangerousness. Williams prepared and executed detailed plans to shoot and kill both of the prosecutors who had successfully convicted him. His wife, Kim, testified that Williams grew "angrier and angrier" after those convictions. He formulated detailed plans for murdering the people he believed had wronged him. He primarily blamed Hasse for his convictions, and he murdered Hasse first. He ambushed Hasse outside the courthouse, shooting him multiple times, and then he fired shots into the air to scare bystanders and effectuate his escape. After Williams killed Hasse, he was happy and ready to kill his next victim.

While telling Kim about his plans to kill McLelland, he stated that Cynthia McLelland would also have to die because she would be a witness. He described her murder as "collateral damage." Immediately after killing the McLellands, Williams was happy. Later that day, his mood was "joyous" as he grilled steaks at his in-laws' house. That evening, he disposed of the weapons he had used to kill Hasse. Far from showing any signs of remorse, Williams felt happy before and after he committed these murders. As the murder investigations proceeded, Williams enjoyed the media attention. He mocked the murder investigations, talked about killing the investigators, and submitted false Crime Stopper

"tips."

Not satisfied with the three murders he had already committed, Williams proceeded with plans to kill additional victims. He planned a particularly gruesome death for his third anticipated victim, Judge Ashworth, whom he had contemplated murdering since 2007. He "scoped out" Judge Ashworth's house and farm, and he assembled the supplies he intended to use. He wanted to make Judge Ashworth's murder particularly gruesome in retaliation for Judge Ashworth's having shared negative information about him with the District Attorney's office in 2012. Williams also intended to kill Judge Wiley, who had declined to approve his excessive bills in 2008, because he felt she had "screwed him over for money."

The record does not support Williams's description of his offenses as "isolated and factually connected incidents" motivated by his desire for revenge against "a few politicians who ruined his life." Williams fully anticipated murdering Cynthia as "collateral damage" because she would be a witness to her husband's murder. He told Kim about going back to shoot Cynthia again after he killed Michael because she was "still moaning." Williams's words and actions demonstrated a general disregard for human life.[29]

Although Williams did not formulate specific plans to kill Judge Ashworth until after Williams's 2012 conviction, Williams had talked to Kim as early as 2007 about killing him because he was "prissy" and "got mad all the time" at "their lunch buddies." Moreover,

---

[29] *See, e.g.*, *Ford v. State*, 919 S.W.2d 107, 112 (Tex. Crim. App. 1996) ("Remorselessness and disregard for human life have been considered in determining the sufficiency of the evidence to support a jury finding of probability of committing criminal acts of violence that would constitute a continuing threat to society.").

Williams's motive for killing his fourth anticipated victim, Judge Wiley—his feeling that Wiley had "screwed him over for money" in 2008—had nothing to do with Williams's 2012 convictions or with his desire for revenge against the "few politicians" whom he blamed for "ruin[ing] his life."

In addition to the three murders Williams had committed and the two murders that he was planning at the time of his arrest, Williams had a general history of making threats when he became angry or wanted to control others. He threatened to kill other attorneys over perceived insults and injuries. He also threatened to kill his wife Kim. He fired a gun at or near Kim, and she believed that he had done so intentionally. Williams had threatened a former girlfriend with a gun in an effort to keep her from walking away from him, and he had pointed a gun at a couple in a church parking lot where he was trying to catch his dog. Williams had also threatened to hit his elderly and ill father-in-law during a dispute over cell phone charges.

Viewing the future dangerousness evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that there was a probability that Williams would commit criminal acts of violence constituting a continuing threat to society. Point of error forty is overruled.

## JURY VOIR DIRE

In points of error one through thirteen, Williams contends that the trial judge erred in denying his challenges for cause against thirteen venire members. He identifies James Freeman, Daniel Chapman, Jerry Wasler, Bryan Campbell, Kelly Shivers, Brooke Padachy,

Nicole Vanwey, Larry Hollifield, Scott Hooper, Sally Williams, David Phillips, Jerry Bolton, and Lesli Mutschler.

When a trial judge denies a defendant's valid challenge for cause, forcing him to use a peremptory strike on a venire member who should have been removed, the defendant is harmed if he would have used that peremptory strike on another objectionable juror.[30]

Article 35.15(a) provides that, in capital cases in which the State seeks the death penalty, the defendant is entitled to fifteen peremptory strikes.[31] In this case, Williams exhausted his fifteen peremptory strikes and received two additional strikes. After he exhausted those strikes, Williams requested and was denied an additional peremptory strike to use against Mutschler. He identified Mutschler as an objectionable juror who would not have sat on the jury, but for the denial of an additional strike.[32] Because appellant received two additional peremptory strikes, he was harmed only if the record reflects that the trial judge erroneously denied his challenges for cause to at least three venire members, so that

---

[30] *Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim. App. 2014); *Chambers v. State*, 866 S.W.2d 9, 22 (Tex. Crim. App. 1993).

[31] *Daniel v. State*, 485 S.W.3d 24, 34 n.4 (Tex. Crim. App. 2016).

[32] *See Buntion v. State*, 482 S.W.3d 58, 83 (Tex. Crim. App. 2016) ("Error [in overruling a challenge for cause] is preserved for review by this Court only if appellant (1) used all of his peremptory strikes, (2) asked for and was refused additional peremptory strikes, and (3) was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause (or granted him additional peremptory strikes so that he might strike the juror).").

he was forced to use peremptory strikes against them.[33]

Contrary to Williams's representations on appeal, however, the record shows that Williams failed to challenge Mutschler for cause. Further, our review of the voir dire record concerning the other complained-of venire members reveals that Williams also failed to challenge Bolton for cause. Accordingly, the trial judge denied Williams's challenges for cause to eleven of the complained-of venire members, not thirteen. In our consideration of Williams's challenges for cause, we need not further discuss the voir dire records of Mutschler and Bolton.

The standard of review on appeal is whether the trial judge abused his discretion when he overruled a challenge for cause.[34] Before a prospective juror may be excused for cause on the basis of bias or prejudice, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views.[35] The proponent of the challenge—in this case, Williams—has the burden to show that the offending venireperson understands the law and cannot overcome his prejudice well enough to follow it.[36] In making this determination, we evaluate the voir dire examination of the prospective juror as a whole and determine whether the record shows that the prospective juror's views would interfere

---

[33] *See Buntion*, 482 S.W.3d at 83.

[34] *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *see also Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009).

[35] *See Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[36] *See Davis*, 329 S.W.3d at 807.

with his ability to serve as a juror and to abide by the oath.[37] We afford great deference to the court's decision because the trial judge is present to observe the demeanor of prospective jurors and to listen to tones of voice.[38] Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory.[39]

*Freeman*

On appeal, Williams asserts that Freeman: (1) would not consider any mitigating evidence, as revealed by his written questionnaire, although he changed his response during individual voir dire; (2) was more likely to believe the testimony of a police officer than the testimony of other witnesses; (3) believed any capital murderer would be a continuing threat to society; (4) shifted the burden to the defendant to prove that he would not be a future danger; and (5) was unqualified because he knew several police officers who had been killed.

At trial, Williams challenged Freeman for cause solely on the ground that Freeman would automatically answer the future dangerousness issue affirmatively if he found a defendant guilty of capital murder, notwithstanding his voir dire responses to the effect that he would "wait to see whether the evidence proved that he would not be a future danger, which simply shifts the burden of proof from the State to the defense." The trial judge denied the challenge. To the extent that Williams's complaints on appeal do not comport

---

[37] *Curry v. State*, 910 S.W.2d 490, 493 (Tex. Crim. App. 1995); *see also Feldman*, 71 S.W.3d at 744.

[38] *Davis*, 329 S.W.3d at 807; *see also Gardner*, 306 S.W.3d at 297.

[39] *Davis*, 329 S.W.3d at 807; *see also Smith*, 297 S.W.3d at 268.

with the grounds he raised at trial, he failed to preserve error.[40] We will only address Williams's arguments that Freeman believed any capital murderer would be a continuing threat to society, and that he shifted the burden to the defendant to prove that he would not be a future danger.

Article 37.071, section 2(c), requires the State to prove the future dangerousness special issue beyond a reasonable doubt.[41] Therefore, any venire member who would automatically answer this special issue in the affirmative, or who would place the burden of proof on the defense, is challengeable for cause under Article 35.16(c)(2) as having a bias or prejudice against a law applicable to the case upon which the defense is entitled to rely.[42]

During voir dire, Freeman indicated several times that he would not automatically impose the death penalty after finding a defendant guilty of capital murder. Rather, he would make the punishment decision based on the facts and circumstances of the particular case. Freeman also stated that he understood that not every defendant found guilty of capital murder was a future danger. However, some of his responses suggested that he believed that anyone who was guilty of an intentional murder committed without legal justification would be a future danger. When the trial judge questioned him, Freeman clarified that he would not always answer the future dangerousness question affirmatively after finding a defendant

---

[40] *See* TEX. R. APP. P. 33.1; *see also Layton v. State*, 280 S.W.3d 235, 239 (Tex. Crim. App. 2009).

[41] *Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).

[42] *Davis*, 329 S.W.3d at 808.

guilty of capital murder. Instead, "[he] would have to hear all the evidence to make that final determination." He would look to the facts of the case to determine whether the defendant would probably be violent to someone else in the future, or whether the defendant would probably never "do it again."

Freeman also vacillated in his responses concerning the burden of proof on the future dangerousness special issue. He indicated several times that he understood that the State had to prove the future dangerousness special issue beyond a reasonable doubt and that he would hold the State to that burden. However, he also stated that he believed that a person who intentionally killed another person, with no legal excuse or justification, would be a future danger. Freeman averred that, if the State could prove that the defendant would "be of violence to somebody else at some time else," then "I would go one way," but if it was proven that the defendant "probably would never do it again, then I think those would be deciding factors of whether or not he gets the death penalty or whether or not he gets life imprisonment."

Freeman's responses concerning the future dangerousness special issue were vacillating and contradictory. When a venire member's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial judge's decision. We conclude that the trial judge did not abuse his discretion by denying Williams's challenge for cause to Freeman.

*Chapman*

Williams asserts that he challenged Chapman for cause because Chapman had formed

an opinion about Williams's guilt, contrary to Article 35.16(a)(10), and he was biased against Williams. Williams also adds that Chapman's written questionnaire answers showed that he would automatically assess the death penalty after finding a defendant guilty of capital murder.

At trial, Williams challenged Chapman for cause solely on the ground that he had formed an opinion of Williams's guilt based on his detailed knowledge of the facts disseminated by the news media. Williams argued that, even though Chapman stated that he could be a fair and impartial juror, his answers during voir dire indicated that he already believed that some of the facts about the case that he had learned from the news were true. To the extent that Williams's complaints on appeal do not comport with this ground raised at trial, we will not consider them.

For an accused to receive a fair trial consistent with due process of law, the jury must determine his guilt or innocence solely on the basis of the evidence admitted at trial and not on the basis of facts or allegations appearing in the media.[43] Article 35.16(a)(10) provides that a prospective juror must be discharged if, from exposure to pre-trial publicity such as newspaper articles or other media, he forms a conclusion as to the guilt or innocence of the defendant that would influence his verdict.[44] However, if a prospective juror testifies that he can set aside any outside influences and render a fair and impartial verdict based upon the

---

[43] *Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992).

[44] *Cooks v. State*, 844 S.W.2d 697, 710 (Tex. Crim. App. 1992); *see also Devoe v. State*, 354 S.W.3d 457, 474 (Tex. Crim. App. 2011).

evidence presented, the trial judge acts within his discretion by denying a challenge for cause.[45]

Initially, when the prosecutor asked Chapman if he had any preconceived ideas of the evidence in this case, Chapman responded that he did not and that he did not "pay a lot of attention to the local media." He added that he had heard some discussion of jury selection while listening to the car radio over the "last couple of days," but he had turned off the radio when he realized the discussion concerned this case. He stated that he had not heard anything that caused him to make up his mind about this case. Chapman asserted several times that he would afford the defendant the presumption of innocence.

In response to a series of leading questions by defense counsel, each of which began, "Do you believe that . . . ," Chapman affirmed that he believed that the McLellands had died from gunshot wounds in their home in Kaufman County as the result of an intentional killing. He believed that, at the time of the killing, Michael McLelland was the District Attorney of Kaufman County and Cynthia was his wife. Chapman stated that he did not know whether the killing was planned in advance and that "that's yet to be determined," although "on the surface, I may have that opinion." He stated that he did not know if Michael McLelland had prosecuted Williams in the past.

When asked if he believed that Williams was responsible for the McLellands' deaths, Chapman responded that he knew that Williams was accused of that. He assumed that

---

[45] *Cooks*, 844 S.W.2d at 710.

Williams would not have been accused if there were not some evidence against him. He stated that he did not know if law enforcement officers had found the weapon used in the killings. When asked if he believed that Williams had rented a storage unit "in the name of another," he acknowledged seeing video footage of a storage unit with a white automobile in it. He recalled that the footage had something to do with a suspect in this case, but he had not heard additional details or formed an opinion about it. In response to additional questions, Chapman stated that he did not know if Williams had rented a storage unit in another person's name or used a Mercury Sable to get to and from a murder scene. He believed that Williams was married but he did not recall the spouse's name. He did not know if she had taken part in the killings, although he believed that she had been arrested in connection with the McLellands' deaths. He did not know if she had been charged with capital murder or had told police that she took part in the killings.

When asked if he had formed an opinion about whether Williams was guilty of the crimes charged, Chapman responded that he had not. He had avoided media stories about the case since learning that he was in the pool of prospective jurors. He assured the court that he would not let details he had learned from media reports "creep into [his] deliberations." He stated that he would consider the evidence, pay close attention to the details presented to the jury, and listen to what the other members of the jury had to say. He reiterated that he presumed that Williams was innocent and that the State had to prove its case beyond a reasonable doubt.

Chapman repeatedly stated that he had not formed any conclusions or opinions about

Williams's guilt or innocence based on the media coverage he had seen. We defer to the trial judge, who was in the best position to evaluate Chapman's demeanor and responses. The trial judge did not abuse his discretion in denying Williams's challenge for cause to Chapman.

## *Walser*

Williams asserts that Walser could not consider the full punishment range for the lesser offense of murder, he would not hold the State to its burden of proof as to each element of the offense, and he was "mitigation impaired," in that he would not fully and fairly consider a defendant's background in answering the mitigation special issue. Additionally, Williams contends that Walser was biased in favor of law enforcement officials because he worked as a security consultant for major corporations.

At trial, defense counsel challenged Walser for cause on the grounds that he had a bias or prejudice against the law upon which Williams was entitled to rely, in that he would not fully and fairly consider and assess a minimum five-year sentence for the lesser-included offense of murder, and he would not hold the State to its burden of proof "on the individual elements of the indictment." Counsel also challenged Walser as being "mitigation impaired" and unable to "fully and fairly consider the defendant's background in answering" the mitigation special issue. To the extent that Williams's complaints on appeal do not comport with the grounds he raised at trial, he failed to preserve error. Therefore, we will not consider Williams's complaint that Walser had a bias in favor of law enforcement officials.

"In a criminal trial, both the defendant and the State have the right to have jurors who

believe in the full range of punishment."[46] A prospective juror who states that he cannot consider the full range of punishment for any offense of which the accused might be found guilty is challengeable for cause under Article 35.16(b)(3) and (c)(2) for having a bias or prejudice against the law.[47] The prospective juror must be able to keep an open mind concerning punishment until he hears the evidence.[48] However, a juror is not challengeable for cause simply because he cannot immediately envision a scenario in which the minimum punishment would be appropriate.[49]

In this case, Walser affirmed that the range of five years to life for an intentional murder was "fair," depending on the facts. Walser later stated that he did not "know about a five year sentence." On further questioning, he indicated that he could keep an open mind and perhaps find a five-year sentence for an intentional murder to be appropriate. He asserted that he thought he could wait and let the facts dictate the appropriate sentence length, but he added that five years seemed "awfully light." He then confirmed that he could keep an open mind to the full range of punishment.

Walser's responses indicated that he could keep an open mind and consider the full punishment range for the lesser-included offense of murder. To the extent that his responses were unclear or contradictory, the trial judge was within his discretion in denying the

---

[46] *Rosales v. State*, 4 S.W.3d 228, 233 (Tex. Crim. App. 1999).

[47] *Ladd*, 3 S.W.3d at 559.

[48] *Johnson v. State*, 982 S.W.2d 403, 406 (Tex. Crim. App. 1998).

[49] *Ladd*, 3 S.W.3d at 559.

challenge for cause on this basis.

Walser stated several times that he would hold the State to its burden of proving all of the elements of capital murder beyond a reasonable doubt, and that he would find the defendant not guilty if he had a reasonable doubt as to any element of the offense. In response to questions involving hypothetical examples, Walser acknowledged that it would be "tough" to find a defendant not guilty if the State proved every element except a "technicality" such as the proper county of jurisdiction or the means of death. However, Walser asserted that he would "make the right decisions" even if he did "not like the right decisions," and he could follow the law.

Walser's responses indicated that he could hold the State to its burden of proof concerning every element of the offense charged. To the extent that his responses were unclear or contradictory, the trial judge was within his discretion in denying the challenge for cause on this basis.

An appellant is not entitled to voir dire prospective jurors on whether they can consider particular types of mitigating evidence during the capital sentencing phase.[50] Furthermore, if a judge does allow such questions and a prospective juror states that he will not consider a particular type of evidence as mitigating, that prospective juror is not challengeable for cause on that basis.[51]

---

[50] *Rosales*, 4 S.W.3d at 233.

[51] *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998).

Walser initially stated that he could keep an open mind regarding mitigation. He had responded negatively to a question on the written jury questionnaire that asked if he thought that "genetics, circumstances of birth, upbringing, and environment should be considered in determining the proper punishment." However, after listening to the prosecutor's explanation of the special issues, he affirmed that he could "at least consider" such evidence and "be open to it."

When questioned by defense counsel, Walser stated that he would always think that a person who had been convicted of capital murder and found to be a future danger should receive the death penalty. Additionally, he acknowledged that any mitigating circumstances would have to be "very substantial" before he could answer the mitigation special issue affirmatively. He did not think that a defendant's background or problems growing up were "an excuse" because "there's evidence everywhere of people that have overcome their backgrounds." He then clarified that background was not "always" an excuse for a person's conduct. He would want the defense and other jurors to persuade him that a defendant's background should affect the sentencing determination.

Williams was not entitled to voir dire Walser on whether he could consider background evidence in mitigation.[52] Further, Walser was not challengeable for cause based on his assertions that he would have a hard time considering background evidence as

[52] *See Rosales*, 4 S.W.3d at 233.

mitigating.[53] To the extent that Walser vacillated about whether he could consider mitigating evidence after finding a defendant guilty of capital murder and answering the future dangerousness special issue affirmatively, the trial judge was within his discretion to deny Williams's challenge for cause on this basis.

### *Campbell*

Williams asserts that Campbell was "mitigation impaired" because he stated that, after finding someone guilty of capital murder and answering the future dangerousness issue affirmatively, the death penalty would be the only option. Williams also avers that Campbell would be unable to give meaningful consideration to any mitigating evidence. On appeal, Williams relies heavily on Campbell's written jury questionnaire responses.

During voir dire, Williams challenged Campbell for cause on the ground that he "expressed unequivocally" that after finding a defendant guilty of capital murder and answering the future dangerousness issue affirmatively, "death would be the only option." Therefore, he would not give full consideration to any of the remaining special issues. Defense counsel also averred that, although Campbell's responses concerning mitigation were "rather equivocating," his questionnaire answer concerning his ability to consider a defendant's background in mitigation indicated that he was "mitigation impaired."

The record reflects that Campbell indicated that he did not believe that someone should be deemed a threat to society simply because he had been found guilty. Campbell

---

[53] *See Raby*, 970 S.W.2d at 3.

affirmed that he would want to consider factors such as motive and background before sentencing someone to death. He also agreed that after answering the future dangerousness question affirmatively, he would still need to consider the other special issues before deciding on the punishment. Campbell gave as examples of mitigating evidence "the way they were treated" and "their upbringing" or environment. He stated that he could keep an open mind concerning mitigating evidence and answer the special issue in such a way that a life sentence would be imposed. Later, Campbell stated that he did not think that environment and upbringing "really carrie[d] that much weight," but he reaffirmed that he would consider such evidence in mitigation. He added that he would also consider evidence of genetics and circumstances of birth.

Later, defense counsel asked Campbell how he would "feel about the death penalty as the only appropriate punishment" for a guilty capital murderer who was a future danger. Campbell responded that "the death penalty would apply." He agreed when counsel asked him if someone who committed capital murder and had been found to be a future danger deserved the death penalty. However, Campbell later stated that he would consider a defendant's character and background, including past good behavior, in answering the punishment issues. The trial judge asked Campbell whether he could still answer the mitigation special issue either affirmatively or negatively after finding someone guilty of capital murder and finding him to be a future danger. Campbell affirmed that he could consider either answer to the mitigation special issue, knowing that a negative answer would result in a death sentence and an affirmative answer would result in a life sentence.

Contrary to Williams's representations, this record does not establish that Campbell would automatically reject the mitigation special issue after finding that a defendant was guilty of capital murder and was a future danger. To the extent that Campbell's answers were vacillating or contradictory, we accord particular deference to the trial judge's decision. Further, Campbell was not challengeable for cause based on his assertions that he did not think that evidence of a defendant's background and environment carried "much weight" in mitigation.[54] The trial judge was within his discretion to deny Williams's challenge for cause.

*Shivers*

Williams complains that Shivers: was unable to presume a defendant innocent until proven guilty; would not consider mitigating evidence and would be an "automatic death sentence"; and understood the meaning of "probability" in the future dangerousness issue to mean "any chance at all." He also avers that she was challengeable for cause because she was familiar with the case and had formed an opinion about his guilt. He adds that her family and social relationships with attorneys and district attorneys who had been threatened or who had faced attempts on their lives had affected her judgment. Williams relies heavily on Shivers's written questionnaire answers that indicated that she favored the death penalty and would not consider mitigation.

At trial, defense counsel challenged Shivers on the grounds that: (1) she could not

---

[54] *See Raby*, 970 S.W.2d at 3.

afford Williams the presumption of innocence and was biased against him because she had volunteered that she was aware that the case involved a couple being murdered in their home, indicating that she already believed some of the elements that the State had to prove; (2) she defined "probability" in the future dangerousness special issue as "any chance at all" or a "mere possibility"; (3) she had a strong belief that the mitigation special issue should not be part of the law and that mitigating circumstances should not be considered; (4) her questionnaire responses showed that she was "mitigation impaired," because she would always give the death penalty to someone convicted of capital murder; and (5) she would want to hear evidence from both sides, which shifted the burden of proof to the defendant. On appeal, Williams has not repeated his complaint at trial that Shivers shifted the burden of proof to the defendant. Further, to the extent that Williams's complaints on appeal do not comport with the grounds he raised at trial, we will not consider them.

During voir dire, Shivers stated that she could presume Williams innocent until she heard evidence proving that he was guilty. She understood that the State had the burden of proof on every element of the offense and that she would have to find the defendant not guilty if the State proved a murder but failed to prove an element such as the county of jurisdiction or the means of death. She thought that she would be a fair juror because she "believe[d] in hearing both sides of the story." Although she later repeated that she would want to hear "both sides," she also affirmed that, if the defense did not present any evidence, she would require the State to prove its case.

Shivers acknowledged that she had heard about "the Kaufman County case" on the

news before she was summoned to the special venire. She stated that she first learned about a district attorney being killed outside the courthouse, and she later heard about the murder of a couple. She had heard Williams's name and recalled that he worked for the county. She recalled hearing that Williams had worked with the husband of the murdered couple. Shivers also recalled hearing that there was a question about whether Williams's wife was involved in the crime. In response to a question about whether she believed the couple had been "shot to death" in their home, Shivers stated that she knew that the couple was dead, but she did not know that they had been shot to death. However, she also repeatedly maintained that she could set this information aside, consider only the evidence presented in court, and hold the State to its burden of proof beyond a reasonable doubt.

In this case, Shivers repeatedly stated that she could set aside the media coverage she had seen and determine Williams's guilt or innocence based solely on the evidence presented in the courtroom. She also stated that she would afford Williams the presumption of innocence. We defer to the trial judge, who was in the best position to evaluate Shivers's demeanor and responses. The trial judge was within his discretion to overrule Williams's challenge for cause on this basis.

We next turn to Williams's challenge for cause based on Shivers's definition of the term "probability."

When the prosecutor asked Shivers for her understanding of the question of whether there was a "probability that the defendant would commit criminal acts of violence," she stated that the question was asking whether the defendant was "capable of doing it again."

She then agreed with the prosecutor's statement that probability meant "more likely than not" rather than "any chance at all." However, in response to a hypothetical question involving a weather forecast, Shivers indicated that probability meant "any chance at all."

Shivers's responses to questions concerning the meaning of the term "probability" were vacillating; she sometimes defined "probability" as "any chance at all," while at other times she agreed that "probability" meant "more likely than not." In this situation, we defer to the trial judge. Further, as the proponent of the challenge for cause, defense counsel was required to carefully and adequately explain the law concerning the distinction and determine whether Shivers continued to insist on a definition that was inconsistent with the distinction.[55] Because defense counsel failed to do so, the trial judge did not abuse his discretion by denying the challenge for cause on this basis.

Williams also contends that Shivers's responses indicate that would render an "automatic death sentence" upon finding a person guilty of capital murder. But Shivers stated that she would not vote for the death penalty in every capital murder case. She asserted that she would set aside her personal opinions and base her verdict on the law that she received in the courtroom. She also said that the State would have to prove the future dangerousness special issue to her before she would answer it affirmatively. When defense

---

[55] *See, e.g.*, *Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003) ("Although we have held that the term 'probability' need not be defined, we have also held that the term means 'more than a mere possibility.' Further, it must be explained to the veniremember that the law requires him to see and accept the distinction[.]").

counsel asked Shivers whether any punishment besides the death penalty would be appropriate for someone she had found guilty of capital murder and had found to be a future danger, she stated that she did not know and that she thought that "the law would tell [her] what would be an alternative punishment."

Concerning the mitigation special issue, Shivers confirmed a written answer on her jury questionnaire to the effect that she did not think that genetics, circumstances at birth, upbringing, and environment should be considered in assessing punishment because "[e]verybody has choices." However, she also stated that she could consider mitigating circumstances and answer the mitigation special issue affirmatively, knowing that it would result in a life sentence.

To the extent that Shivers's statements were unclear or vacillating, we defer to the trial judge. Additionally, Shivers's responses to defense counsel's questions as to whether she would consider particular types of evidence in mitigation did not make her challengeable for cause.[56] The trial judge was within his discretion to deny Williams's challenge for cause on these bases.

### Padachy

Williams asserts that Padachy was biased against the law Williams was entitled to rely upon. Specifically, he asserts that she would automatically answer the future dangerousness issue affirmatively after finding a defendant guilty of capital murder. He also asserts that she

---

[56] *See Rosales*, 4 S.W.3d at 233; *Raby*, 970 S.W.2d at 3.

stated that anyone who intentionally killed another person should be sentenced to death.

During voir dire, Padachy stated that she could wait and listen to all of the evidence and require the State to prove a defendant's future dangerousness beyond a reasonable doubt. When asked about a written questionnaire response in which she indicated that the death penalty was appropriate for an intentional murder, she clarified that she had provided that response while thinking of premeditated murder. When asked about a questionnaire response in which she wrote that "in most cases, when a person takes someone's life on purpose, they are a threat to others," she again stated that she envisioned someone planning a killing in advance. Padachy acknowledged that she still believed that to be true. Some of Padachy's responses to defense counsel's questions suggested that she believed that a person who committed an intentional killing would always be a future danger. However, she also stated several times that she could keep an open mind, listen to both sides, require the State to prove future dangerousness, and weigh all the evidence before answering the special issues.

Williams then challenged Padachy for cause "for the reason she has a bias or prejudice against the law the defense is entitled to rely upon," in that she stated that she would automatically answer the future dangerousness special issue affirmatively after finding someone guilty of capital murder. The prosecutor stated that Padachy had given contradictory answers on the matter and requested that the trial judge go over the law with her to ascertain whether she could follow it. Defense counsel responded that Padachy had consistently stated that if she found someone guilty of an intentional killing, she would always find that person to be a future danger. The trial judge then called Padachy into the

courtroom for additional questioning.

The prosecutor asked Padachy whether she would automatically answer the future dangerousness special issue or whether she could follow the law and require the State to prove the issue beyond a reasonable doubt. She responded that she could follow the law and consider the facts of the case based on the evidence she heard from both phases of the trial. Padachy indicated that her written questionnaire answers were based on her personal feelings before she knew the law. When defense counsel questioned Padachy, she again stated that she had provided her questionnaire answers favoring the death penalty for an intentional killing before she knew the law. She stated that the question of a defendant's future dangerousness would depend on the evidence. She averred that she could follow the law regardless of her personal feelings. Defense counsel again challenged Padachy for cause, stating that it was "pretty plain what [she] is going to do, that she's substantially impaired in her ability to follow the law and give us a fair hearing on [the future dangerousness] special issue."

As the proponent of the challenge for cause, Williams had to show that Padachy understood the requirements of the law and could not overcome her prejudice well enough to follow it. Williams did not make this showing. Further, to the extent that Padachy's responses were unclear or contradictory, we defer to the trial judge. Thus, the trial judge did not abuse his discretion by denying Williams's challenge for cause to Padachy.

*Vanwey*

Williams asserts that Vanwey would "automatically and categorically impose the

death penalty." He argues that her written questionnaire responses, and her evident confusion concerning the mitigation issue during individual voir dire, established that she was biased against Williams and the law upon which he was entitled to rely.

Williams challenged Vanwey for cause on the ground that she considered the punishment phase of the trial, and particularly the mitigation special issue, "to be a rehash of the guilt/innocence phase." He asserted that she stated that the mitigation special issue in particular was confusing and that her "gut reaction" was to read the mitigation issue as if it asked about Williams's guilt. Williams also averred that Vanwey would "automatically and categorically impose the death penalty."

During voir dire, Vanwey confirmed her written questionnaire responses indicating that she felt the death penalty was appropriate in some but not all murder cases and that she disagreed with the statement that a person convicted of capital murder should be assessed the death penalty. She affirmed her view that some capital murder cases merited a death sentence, while others merited a life sentence. She stated that, after finding someone guilty of an intentional murder, she would still be open to either a life or death sentence, and she could consider evidence at the punishment phase and answer the special issues according to the evidence. Vanwey indicated that she could answer the future dangerousness special issue negatively if the State did not prove that the defendant "was gonna be bad the rest of his life." She also asserted that, if she found the defendant guilty and answered the future dangerousness and anti-parties issues affirmatively, she would still consider mitigating evidence before deciding whether to answer the mitigation special issue affirmatively or

negatively.

Vanwey then stated, somewhat inconsistently, that she could not give a life sentence to an intentional murderer who would probably commit another murder. However, after the prosecutor further explained the law, Vanwey stated that, even after finding that a defendant had committed capital murder and was a future danger, she could keep an open mind concerning mitigation until she heard the evidence. She affirmed that she could consider the circumstances of the offense and the defendant's character and background in reaching a decision. Vanwey acknowledged that one of her questionnaire responses suggested that she believed that anyone found guilty of capital murder should receive the death penalty, and that she still felt that way. However, she also stated that, after the law had been explained to her, she would be able to set aside her personal views and follow it. She denied feeling that anyone convicted of capital murder should automatically receive the death penalty.

When asked what the term "mitigating" meant to her, Vanwey responded, "it's causes in their lives that made them do this or not do this." She also indicated that it was hard to consider the mitigation special issue in the abstract because even a person with an unfortunate background had "the choice" of whether to take a life. She stated that the mitigation special issue did not "really make sense" to her and she did not know how it would work out in court. She acknowledged that the "ultimate issue" for her was whether the defendant committed the murder and the reasons why he did it.

As the proponent of the challenge for cause, Williams had to show that Vanwey understood the requirements of the law and could not overcome her prejudice well enough

to follow it. Although some of Vanwey's responses indicated that she believed all capital murderers should receive the death penalty, she also stated that she could set aside her personal feelings and keep an open mind to the punishment evidence and the special issues. To the extent that Vanwey's responses were unclear or contradictory, we defer to the trial judge's decision. Thus, the trial judge did not abuse his discretion by denying Williams's challenge for cause.

*Hollifield*

Williams asserts that Hollifield was "mitigation impaired." He also asserts that Hollifield, after finding a defendant guilty of capital murder, would automatically answer the special issues in such a way that the death penalty would result. He adds that Hollifield would always assess the death penalty against a defendant who killed a public official, he would not consider mitigation, and he would believe the testimony of a police officer over that of other witnesses. He relies heavily on Hollifield's written jury questionnaire responses.

Williams, however, challenged Hollifield for cause solely on the ground that he gave contradictory responses concerning his ability to consider and give effect to evidence in mitigation, and he "probably [was] mitigation impaired." Thus, Williams failed to preserve all but one of the claims he now raises on appeal. We will consider only his claim that Hollifield was "mitigation impaired."

When the prosecutor explained the special issues and stated that jurors had to consider the circumstances of the offense and the defendant's character and background in answering

the mitigation special issue, Hollifield affirmed that he could consider such evidence. He stated that he could find someone guilty of an intentional murder, answer the future dangerousness issue affirmatively, and still consider whether the evidence was sufficiently mitigating to warrant a life sentence. Hollifield also stated his belief that not everyone who committed an intentional murder should receive a death sentence. He added that he would be able to set aside his personal views in favor of the death penalty and follow the law as it had been explained to him.

Defense counsel prefaced his questioning of Hollifield by stating that counsel would inquire into how Hollifield "felt," rather than his understanding of the application of the special issues. Defense counsel then asked Hollifield about his written questionnaire response to the effect that he did not feel that genetics, circumstances of birth, upbringing, and environment should be considered when determining the proper punishment of someone convicted of capital murder. Hollifield explained his view that a person's upbringing should not affect his ability to commit a murder. He stated, "I think I misunderstood how the—what the question was trying to ask." He again stated that he did not believe that every murderer should receive a death sentence.

Hollifield also stated that he believed that someone who committed an offense such as the murder of a district attorney or a judge deserved the death penalty. When defense counsel asked him whether there should be a connection between the evidence he would consider concerning the mitigation special issue and the crime, he agreed that there should. He explained that he would want to consider what led the person to commit the crime. When

defense counsel asked him about specific types of mitigating evidence, Hollifield stated that he could consider evidence of a defendant's early childhood background in answering the mitigation special issue. He concurred that, after finding someone guilty of capital murder and determining that the person would be a future danger, he would still be able to decide whether he thought the evidence was sufficiently mitigating to warrant a sentence of life without parole.

As the proponent of the challenge for cause, Williams had to show that Hollifield understood the requirements of the law and could not overcome his prejudice well enough to follow it. Although Hollifield suggested one time that defendants convicted of certain types of capital murders deserved the death penalty, he also stated several times that he would consider mitigating evidence in answering the special issues. To the extent that Hollifield's responses were unclear or contradictory, we defer to the trial judge's decision. We find that the trial judge did not abuse his discretion by denying Williams's challenge for cause to Hollifield.

*Phillips*

Williams asserts that Phillips's questionnaire responses indicated that he: was predisposed in favor of the death penalty; had been exposed to media coverage of the case; was mitigation-impaired; would believe the testimony of a police officer over that of other witnesses; and would automatically answer the special issues in such a way that the death sentence would be imposed.

During voir dire, Williams challenged Phillips for cause on the sole ground that

Phillips would not be able to give meaningful consideration to mitigating evidence because he had stated that he was "very likely not going to consider" factors that were germane to the mitigation special issue. To the extent that Williams's claims on appeal do not comport with the ground he raised at trial, we will not consider them. Accordingly, we will consider only whether Phillips would be able to give meaningful consideration to mitigating evidence.

The record reflects that the prosecutor asked Phillips what would "be important" to him in a punishment hearing. He responded that he would like to know about the defendant's history, past criminal behavior, motives for the crime, and mental capacity. The prosecutor also asked Phillips about his written questionnaire response in which he had stated that he did not believe that life without parole would be appropriate because of the cost to the State. Phillips indicated that he had not known about the special issues when he answered that question and that he would go by the law rather than by his personal views. The prosecutor further asked Phillips if he would be open to reviewing mitigating evidence after finding that a defendant was guilty of capital murder and posed a future danger. Phillips responded that he thought he could be open, but he also stated that he sometimes had a problem considering a person's background because "you make your own choices [about] what you do in life." However, he reiterated several times that he could set aside his personal feelings, follow the law, and consider mitigating evidence before answering the mitigation special issue.

When questioned by defense counsel, Phillips stated that he believed that the death penalty should be considered for someone who planned and committed a multiple murder, even if that person had not committed previous crimes. He also indicated that he felt that

someone who committed an awful crime should have to pay for it with his own life. Phillips further acknowledged that he felt that a person convicted of capital murder should receive the death penalty. However, when defense counsel asked him whether he could ever find anything sufficiently mitigating to merit a life sentence, Phillips reiterated that, "after listening to the law," he would consider everything that he heard before making a decision on the mitigation special issue. He stated that he could "make a decision at the end of the day" without "any kind of pre-notions in my head what should or shouldn't be."

As the proponent of the challenge for cause, Williams had to show that Phillips understood the requirements of the law and could not overcome his prejudice well enough to follow it. Although Phillips indicated that he personally believed that defendants convicted of capital murder deserved the death penalty, he also stated that he would keep an open mind and consider potentially mitigating evidence in answering the mitigation special issue. To the extent that Phillips's responses were unclear or contradictory, we defer to the trial judge's decision. The trial judge did not abuse his discretion by denying Williams's challenge for cause to Phillips.

Because Williams has failed to show that the trial judge erred when he denied his challenges for cause to at least three prospective jurors, he has not shown that he is entitled to relief. Therefore, we need not consider whether the trial judge erred in denying Williams's challenges to venire members Hooper and S. Williams. Points of error one through thirteen are overruled.

In points of error fourteen and fifteen, Williams contends that the jury was biased or prejudiced, which deprived him of a fair trial under the federal and Texas constitutions. Specifically, Williams asserts that, based on the trial judge's erroneous denials of his challenges for cause as described in points of error one through thirteen, he was deprived of "a lawfully constituted unbiased and non[-]prejudicial group of jurors." He submits that "one or all or any combination of errors as previously complained about concerning jury selection constitute a violation of the United States Constitution" and the Texas constitution. However, because Williams has failed to show that the trial judge erred when he denied his challenges for cause to at least three prospective jurors, he has not shown that he is entitled to relief. Points of error fourteen and fifteen are overruled.

VERDICT FORMS

In point of error sixteen, Williams contends that the trial judge erred in denying his "requested jury verdict form that allowed the jury to make a determination of guilt/innocence on each alleged manner and means of committing the alleged offense rather than a general verdict." He notes that the indictment charged him with capital murder as an intentional murder committed during the commission of a burglary, as well as with capital murder by murdering more than one person during the same transaction. He asserts that he was therefore entitled to two verdict forms. He argues, "With only one verdict form, there is no way of knowing if the jury was unanimous on which fact situation was proven if either was beyond a reasonable doubt." He complains that the failure to provide two verdict forms

violated his "constitutional and statutory right to a unanimous jury verdict" which "caused egregious harm to his right [to] a fair and impartial trial."

The record reflects that, during the guilt-phase charge conference, defense counsel asked that the verdict form "allow the jury to make a determination of guilt or innocence as to each specific count of the indictment rather than a general verdict." The trial judge overruled this request. Shortly before the charge was given to the jury, defense counsel clarified that the indictment did not charge two "counts" but instead charged one offense in two alternative paragraphs. He re-urged his request for a separate verdict form for each paragraph, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The prosecutor responded that the single verdict form was "proper under Gamboa v. State[.]"[57] The trial judge again denied defense counsel's request for separate verdict forms.

"[A]lternate pleading of the differing methods of committing one offense may be charged in one indictment."[58] Likewise, "alternate theories of committing the same offense may be submitted disjunctively in the jury charge without violating the right to jury unanimity."[59] Where alternate theories of committing the same offense are submitted to the jury in the disjunctive, it is appropriate "for the jury to return a general verdict if the evidence

[57] *Gamboa v. State*, 296 S.W.3d 574 (Tex. Crim. App. 2009).

[58] *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

[59] *Gamboa*, 296 S.W.3d at 582-83 (citing *Kitchens*, 823 S.W.2d at 258).

is sufficient to support a finding under any of the theories submitted."[60]  Our holding in

*Kitchens* applies to all alternate theories of capital murder in Section 19.03, without regard

to whether the theories are listed in different subsections, "so long as the same victim is

alleged for the predicate murder."[61]

In this case, Cynthia McLelland was the named victim in both alternative paragraphs

of the indictment.  Thus, the same victim was alleged for the predicate murder.  Accordingly,

the use of a single jury verdict form that allowed the jury to return a general verdict did not

violate Williams's right to a unanimous jury verdict.  Point of error sixteen is overruled.

## GUILT-PHASE EXTRANEOUS OFFENSE EVIDENCE

In point of error seventeen, Williams asserts that the trial judge erred in overruling his

objection to the testimony of Judge Michael Chitty, who presided over Williams's 2012 trial.

He contends that this testimony was improper under Texas Rule of Evidence 404(b), which

provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's

character in order to show that on a particular occasion the person acted in accordance with

the character."[62]  However, Rule 404(b)(2) admits of an exception: "This evidence may be

admissible for another purpose, such as," among other things, "proving motive."[63]  The trial

judge would not abuse his discretion to determine that Williams's prior prosecution for theft

---

[60]  *Kitchens*, 823 S.W.2d at 258.

[61]  *Gamboa*, 296 S.W.3d at 584.

[62]  TEX. R. EVID. 404(b).

[63]  *Id.* R. 404(b)(2).

supplied a motive for murdering the prosecutor who represented the State in the case against him. The complained-of testimony was probative of this motive. Point of error seventeen is overruled.

In point of error eighteen, Williams contends, "The trial judge erred in overruling appellant's objection to the State presenting evidence of an extraneous offense; to-wit: the murder of Mr. Mark Hasse in the guilt/innocence stage of the trial." Williams's citation to the record directs us to a pretrial hearing in which, he asserts, "[t]he trial court overruled Appellant's objection and allowed evidence of the extraneous offense of Prosecutor, Mr. Mark Hasse." However, Williams fails to provide a record citation directing us to any instance during the guilt phase in which the prosecutor presented such evidence to the jury.[64] Our independent review of the record establishes that the prosecutor did not present the jury with any evidence of this extraneous offense during the guilt phase.[65] Point of error eighteen is overruled.

In point of error nineteen, Williams asserts that the trial judge erred in overruling his objection "to State's Exhibit 155, a photograph of an improvised incendiary device not listed in the State's Rule of Evidence 404(b) Notice to the Defense." He argues that the lack of

---

[64] *See Roberts v. State*, 220 S.W.3d 521, 527 (Tex. Crim. App. 2007) (stating that a party has an obligation to make appropriate citations to the record in support of his argument, and an appellant procedurally defaults error by failing to include a matter in the record necessary to evaluate his claim).

[65] *See Galitz v. State*, 617 S.W.2d 949, 952 & n.10 (Tex. Crim. App. 1981) (observing that, when objectionable evidence is not offered, "it is as if the objection had been sustained" because "the objecting party has received all the relief sought").

notice "compromised defense counsel's ability to adequately cross-examine the witness concerning the lack of nexus of possession of the alleged device to the 'McLelland' shooting events." He further contends that the lack of notice deprived him of his rights to due process and a fair trial.

Rule 404(b) provides, in relevant part, "On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce [evidence of a crime, wrong, or other act]—other than that arising in the same transaction—in its case-in-chief."[66] In this case, Williams provides no citation to the record directing us to whether and when he requested notice. Further, although Williams asserts that he objected to the lack of notice, he fails to provide any record cite directing us to his objection during the proceedings. Therefore, his point of error is inadequately briefed.

Nonetheless, contrary to Williams's assertions, the clerk's record contains a file-stamped "State's Preliminary Notice of Extraneous Offenses" that lists the improvised incendiary device. The certificate of service reflects that the prosecutor both mailed and e-mailed this document to defense counsel on September 2, 2014. Williams's assertions are not supported by the record. Point of error nineteen is overruled.

## BALLISTICS EXPERT

In point of error twenty, Williams contends that the trial judge erred in overruling his objection to the testimony of James Jeffress, the State's expert witness on ballistics evidence.

---

[66] TEX. R. EVID. 404(b).

Specifically, Williams asserts that Jeffress "was not properly qualified and did not meet the 'Kelly'[67] standards of proof." Further, he contends, firearms and ballistic comparison evidence does not "meet the heightened reliability requirement of the Eighth Amendment." Williams also argues that there "is no objective source material on the record to substantiate Mr. Jeffress's methodology[,] statistical validation[,] or error rate" and so Jeffress's opinions were speculative. Thus, Williams asserts, the trial judge abused his discretion by admitting Jeffress's testimony, and this error affected Williams's substantial rights to a fair trial at the guilt phase.

Williams's complaint that Jeffress was not qualified does not comport with his objections during the *Daubert*[68] hearing, and so it is not preserved. However, Williams did assert during the *Daubert* hearing that the field of firearms and ballistic comparison was "devoid of any statistical validation whatsoever" and was based on proficiency testing that did not "indicate an error rate for any examiner." He also complained that "there is a lot of contention" about whether Jeffress's method of examination was the method with the greatest degree of accuracy. Finally, he stated that Jeffress could not "testify to the facts in absolute terms as he has that this evidence all originated from the same firearms." These allegations at trial preserved Williams's complaints on appeal concerning the reliability of the field of firearms and ballistic comparison, Jeffress's methodology, and Jeffress's opinion

---

[67] *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

[68] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).

based on his comparisons. Therefore, we will address the merits of these complaints.

An appellate court reviews a trial judge's decision to admit or exclude scientific expert testimony for an abuse of discretion.[69] "The trial court hearing is the main event for *Daubert/Kelly* gatekeeping hearings; it is not a try-out on the road to an appellate scientific seminar."[70] If the trial judge's ruling is within the zone of reasonable disagreement, then it will be upheld.[71]

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."[72] Under Texas Rule of Evidence 702, the trial judge determines whether the proffered scientific evidence is sufficiently reliable and relevant to aid the jury.[73] Reliability refers to the scientific basis for the testimony, while relevance refers to the "fit" of the scientific principles to the evidence.[74]

The proponent of the scientific evidence must demonstrate through clear and

---

[69] *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

[70] *Hernandez v. State*, 116 S.W.3d 26, 30 (Tex. Crim. App. 2003).

[71] *Sexton v. State*, 93 S.W.3d 96, 99-100 (Tex. Crim. App. 2002).

[72] TEX. R. EVID. 702 (West 2014).

[73] *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000); *see also Daubert*, 509 U.S. at 589.

[74] *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013).

convincing evidence that the evidence is in fact reliable.[75]  The proponent of the evidence meets this burden by showing that:  (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question.[76]  Some factors that might influence a trial judge's determination of reliability include:  (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the existence of literature supporting or rejecting the underlying scientific theory and technique; (3) the clarity with which the underlying scientific theory and technique can be explained to the court; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the qualifications of the expert(s) testifying; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.[77]

Jeffress's testimony demonstrated that:  the theory of firearm and toolmark identification and the technique of microscopic firearm and toolmark comparison are accepted as valid by the relevant scientific community; literature exists supporting the underlying theory and technique; and the theory and technique could be clearly explained to the court.  Jeffress acknowledged that a precise casework error rate could not be measured, but he pointed out that consecutive-manufacture and proficiency studies provided error rates

---

[75] *Kelly*, 824 S.W.2d at 573.

[76] *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012).

[77] *Sexton*, 93 S.W.3d at 100.

in the context of controlled studies. Those known error rates could then be used to estimate casework error rates. Additionally, the implementation of professional standards and protocols, periodic lab audits and proficiency testing, and the independent review of the comparisons in each case by a second examiner, helped counteract the subjective elements of an examiner's conclusions.

Jeffress's testimony also established the availability of other experts to test and evaluate the technique; his qualifications as an expert; and his experience and skill in applying the technique in this case. We conclude that the trial judge did not abuse his discretion by determining that the State had established the reliability of Jeffress's expert testimony by clear and convincing evidence, and by admitting Jeffress's testimony. Point of error twenty is overruled.

## IN-COURT IDENTIFICATIONS

In point of error twenty-one, Williams contends that the trial judge erred in overruling his objection to "in court identification." He avers that defense counsel "argued that any in-court identification in front of the jury should be preceded by a properly conducted pre-trial identification procedure in compliance with the United State[s] Supreme Court factors discussed in Neil v. Biggers[.]"[78] Williams argues that overruling his objection violated his right to due process, "and any other identification procedure was substantially more prejudicial than probative under Tex. R. Evid. 403." He provides record citations to the in-

---

[78] *See Neil v. Biggers*, 409 U.S. 188, 198 (1972).

court identifications of him by Judge Chitty, Rodger Williams, David Hunt, and Edward Cole.

The United States Supreme Court's opinion in *Biggers* does not support Williams's contention that he had a due process right to require the State's witnesses to identify him in pre-trial identification proceedings outside the jury's presence before they identified him in court.[79] Due process guards against a pretrial identification that poses "a very substantial likelihood of irreparable misidentification."[80] "It is the likelihood of misidentification which violates a defendant's right to due process."[81] Williams does not argue that there was any substantial likelihood of misidentification in the complained-of in-court identifications. Further, Williams makes no argument in support of his assertion that the failure to conduct pre-trial identifications caused the in-court identifications to be "substantially more prejudicial than probative under Tex. R. Evid. 403." We will not make his argument for him.[82]

In any event, three of the four witnesses about whom Williams complains—Chitty, Rodger, and Hunt—knew Williams before the offense alleged in the indictment. Chitty met Williams in the early 1990s when Williams was a court coordinator, and he also presided over Williams's 2012 trial. Rodger and Hunt were both acquainted with Williams from their

---

[79] *Id.*

[80] *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

[81] *Biggers*, 409 U.S. at 198.

[82] TEX. R. APP. P. 38.1; *see Lucio*, 351 S.W.3d at 896.

time in the Texas State Guard.  Cole was not previously acquainted with Williams, but his in-court identification of Williams was probative because Cole recognized Williams as the man who had identified himself as "Richard Greene" when purchasing the Crown Victoria that was used in the instant offense.  Cole's in-court identification of Williams was inculpatory, but the record contains no indication that this identification violated due process or was unduly prejudicial.  Point of error twenty-one is overruled.

## MOTIONS FOR CONTINUANCE AND NEW TRIAL

In point of error twenty-three, Williams asserts that the trial judge erred in overruling his motion for a new punishment-phase trial because the court failed to grant his motion for continuance and provide him with an opportunity to properly investigate, develop, and present mitigating evidence at the punishment phase.  In point of error twenty-four, appellant asserts that the trial judge erred in denying his motion for continuance, which, if granted, would have provided him with an opportunity to investigate and discover the mitigating evidence that he later presented at the motion for new trial hearing.  Appellant briefs these interrelated points of error together, and we will address them accordingly.

A criminal action may be continued on the written motion of a party for sufficient cause shown.[83]  The motion must be sworn to by someone who has personal knowledge of the facts relied on for the continuance.[84]  "[T]o preserve for review a claim that the trial court

---

[83]  *See* Art. 29.03; *Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005).

[84]  Art. 29.08; *see Harrison*, 187 S.W.3d at 434.

erred in denying a motion for continuance, the defendant must timely file a motion that sufficiently advises the trial court of the defendant's request and the grounds therefor."[85] "We review a trial court's ruling on a motion for continuance for abuse of discretion."[86] "[I]n order to show reversible error predicated on the denial of a pretrial motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of a continuance harmed him."[87]

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."[88] "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel."[89]

Additionally, when moving for a continuance based upon the need for additional trial

---

[85] *Harrison*, 187 S.W.3d at 433.

[86] *Gallo v. State*, 239 S.W.3d 757, 764-65 (Tex. Crim. App. 2007) (citing *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)).

[87] *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010); *see also Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995) ("To find an abuse of discretion in refusing to grant a motion for continuance, there must be a showing that the defendant was prejudiced by his counsel's inadequate preparation time.").

[88] *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

[89] *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar*, 376 U.S. at 589).

preparation, a defendant must make some showing of diligence.[90] A trial judge reasonably denies a defendant's motion for continuance which fails to state the diligence exercised in trying to obtain expert assistance sooner, or, alternatively, how circumstances conspired to prevent the defendant from realizing any earlier that he required such assistance.[91] For example, in *Wright v. State*, we concluded that the trial judge did not abuse his discretion by denying a motion for a continuance to afford the defense's DNA expert time to review DNA results, when the defendant had been notified in late September that the State was conducting DNA testing and had received DNA reports from the State in October and November, but failed to request an expert until December 1, which was the first day of trial.[92] A motion for continuance must reflect "not only diligence in procuring the presence of the witness, but also diligence as reflected in the timeliness with which the motion for continuance was presented."[93]

The record in this case reflects that defense counsel received notice, no later than July 26, 2013, that the State intended to seek the death penalty. Nevertheless, defense counsel did not request funding for an expert pathologist to assist the defense in investigating "Williams's medical history and present medical health for possible presentation to a jury as

---

[90] *See Gonzales*, 304 S.W.3d at 843.

[91] *Id*. at 843-44.

[92] 28 S.W.3d 526, 532-33 (Tex. Crim. App. 2000) ("Even if appellant could point to specific prejudice . . . , he would not now be allowed to profit from his own failure to act[.]").

[93] *See Dewberry v. State*, 4 S.W.3d 735, 756 (Tex. Crim. App. 1999).

mitigation" until March 2014. Defense counsel could have known sooner that he would require expert assistance for such an investigation, given that one reason for requesting funding for a pathologist was Kim's 2012 trial testimony about Williams's medical problems. The trial judge granted the funding motion on March 17, 2014, but did not sign an order granting Dr. Yount access to Williams in jail until June 19, 2014. The record contains no explanation for this delay.[94]

On May 5, 2014, the trial judge granted defense counsel's requested funding for the assistance of a neuropsychologist, and counsel designated Dr. James Merikangas for this role. That funding motion showed that defense counsel was aware of the need to investigate Williams's medical and mental conditions, as well as the value of receiving "the assistance of a licensed medical doctor and board-certified neuropsychologist for an initial review of documents and a consultation" and "to assess additional need for psychological evaluation and examination, and to provide targeted guidance as to appropriate experts, as needed." The record before us does not indicate whether or when Dr. Merikangas investigated Williams's medical and mental conditions.[95]

In addition, on July 30 and 31, 2014, the trial judge granted defense counsel's request for funding for a psychologist, Dr. Joan Mayfield, Ph.D. Mayfield completed psychological

---

[94] *Cf. Gonzales*, 304 S.W.3d at 843-44 (stating that, in seeking a continuance, the defendant must explain the diligence exercised in trying to obtain expert assistance sooner, or, alternatively, how circumstances conspired to prevent him from realizing any earlier that he required such assistance).

[95] *Cf. id.*

testing on August 2. Defense counsel's motion for continuance, filed a month later on September 2, 2014, and re-urged periodically through November 14, 2014, mentioned the need to investigate mitigating evidence, but failed to specifically refer to Williams's medical and mental conditions.

Defense counsel's preliminary designation of Drs. Mayfield, Merikangas, and Yount as defense experts, filed on September 23, 2014, was the first pleading in which counsel mentioned brain scans. This designation came six months after Williams's March 2014 motion for an expert pathologist, in which defense counsel referenced a need to investigate Williams's medical history and mental health; four months after counsel received funding for a neuropsychologist; and almost two months after Mayfield completed a psychological evaluation. Defense counsel still did not request a continuance on the ground that he needed additional time to investigate Williams's medical and mental conditions.

In addition, the September 23 pleading showed that defense counsel was then aware of the advisability of brain imaging as a means of developing mitigating evidence. However, counsel did not file a motion requesting funding for a psychologist to assist the defense in determining the specific type of brain imaging required until October 24, 2014. The record contains no explanation for this delay. The trial judge granted this motion on October 27, and granted the psychologist access to Williams on October 31.

Not until November 9, 2014, did defense counsel file a motion seeking funds for a neuro-radiologist to order brain scans. Two days later, defense counsel learned that the trial

judge required additional support for this funding request. Even so, when counsel orally re-urged his previous motion for a continuance at a hearing on November 14, 2014, he did not mention that the defense needed additional time to complete brain imaging. Further, defense counsel did not provide additional support for the November 9 funding request until November 27, 2014, which was Thanksgiving Day. The trial was scheduled to begin the following Monday, on December 1.

Then, on the first day of trial, defense counsel moved for a continuance on the ground that Williams "cannot safely go to trial without the benefit of the further medical testing to assess any brain damage he may have suffered." This last-minute motion for continuance failed to show that defense counsel had exercised diligence in trying to obtain expert assistance concerning the brain scans sooner, or, alternatively, how circumstances had conspired to prevent counsel from realizing any earlier that he required such assistance.[96] Nor did the motion state the diligence that counsel had exercised in presenting the motion for continuance.[97] Defense counsel stated only, "Thus far, the trial court has denied such funding." But counsel failed to acknowledge that he had not requested funding until November 9. Counsel knew as early as November 11 that the court would not grant funding without additional support. However, counsel failed to provide such support until the holiday weekend immediately preceding the first day of trial. The trial judge did not abuse his

[96] *See id.*

[97] *See Dewberry*, 4 S.W.3d at 756.

discretion by denying Williams's December 1, 2014, motion for continuance to complete the brain scans.

When defense counsel again moved for continuances on December 8, 10, and 15, 2014, counsel provided details concerning the defense team's efforts to obtain the scans following the court's December 3 funding grant. However, nothing in these subsequent motions indicated that counsel had exercised diligence in trying to obtain funding for the scans before trial or that circumstances had conspired to prevent counsel from realizing sooner that he needed them. Accordingly, the trial judge did not abuse his discretion by again denying these motions.

Having concluded that the trial judge did not err by denying Williams's motions for continuance based on the reasons that were before him at the time of the denials, we need not discuss the brain-imaging evidence that was developed during the motion for new trial proceedings.[98] Points of error twenty-three and twenty-four are overruled.

In point of error twenty-five, Williams contends that the "trial court erred in denying [his] motion for new trial arguing he was denied due process of law because of judicial bias in how the trial was conducted." He asserts that, at the motion for new trial hearing, defense counsel described the trial judge's facial expressions, demeanor, and "a pattern of inconsistent rulings and disparate treatment between defense counsel and the prosecution."

---

[98] *See Gonzales*, 304 S.W.3d at 843 ("[I]n order to show reversible error predicated on the denial of a pretrial motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of a continuance harmed him.").

Williams states that defense counsel argued that the trial judge's facial expressions and rulings, particularly during the punishment phase, demonstrated favoritism toward the State and antagonism toward the defense. Williams also avers that defense counsel noted at the motion for new trial hearing that, after the punishment verdict, the trial judge "compared the defendant to numerous notorious nationally known murderers, which revealed the court's attitude to the defense's mitigation evidence."

As an initial matter, we observe that the judge who presided over Williams's motion for new trial hearing was not the judge who presided over Williams's trial. At the motion for new trial hearing, defense counsel presented an audiovisual recording of the trial proceedings that defense counsel obtained from the Dallas CBS affiliate after trial. Defense counsel also compiled a spreadsheet to identify particular segments on the recording which allegedly showed the trial judge directing "derisive" or "annoyed" looks at defense counsel or "the defense table." Counsel also argued that the trial judge had exhibited a pattern "of inconsistent rulings and disparate treatment between defense counsel and the prosecution," but counsel did not specify the rulings and treatment that formed the basis of this claim.

On appeal, Williams has provided, in an appendix to his brief, still images or "screen shots" taken from the recording after trial. He asserts that these still images demonstrate the trial judge's unfavorable demeanor toward the defense.

Williams does not assert, and he has not provided a record citation demonstrating, that he complained of judicial bias at trial. Nor does Williams provide any authority for the

proposition that this error is immune from ordinary principles of procedural default. Thus, he has inadequately briefed this point of error. We decline to make his arguments for him. Point of error twenty-five is overruled.

## ADMISSION OF EVIDENCE

### *Hasse Crime Scene*

In point of error twenty-six, Williams asserts that the trial judge erred at the punishment phase in overruling his objection to State's Exhibit 528, a video recording of the Hasse crime scene. He argues on appeal that the video was more prejudicial than probative and was likely to "inflame the jury."

The record reflects that Sergeant Jason Stastny testified that, on January 31, 2013, around 8:40 a.m., he heard gunshots while he was investigating a burglary at an address about seven blocks north of the courthouse. He and his partner left the burglary investigation and drove toward the area where Stastny believed the shots had been fired. He heard a call on his radio that shots had been fired at the courthouse. When he arrived, he saw a woman giving CPR to a man lying on the south side of the street. He parked his car in such a way that its dashboard camera recorded the scene. Stastny testified that he took over performing CPR on the man, who appeared to have a gunshot wound in front of his left ear and was bleeding behind his ear. The man attempted to breathe, but then he would stop breathing and Stastny would resume CPR. The man took a total of six or seven breaths while Stastny was performing CPR, but he ceased breathing before the paramedics arrived. After paramedics

took the man to the hospital, Stastny spent the rest of the day searching for the suspect vehicle.

Stastny testified that he had provided the prosecutor with a copy of his dashboard camera video of the scene. He testified that he had viewed and initialed State's Exhibit 528, and that it was a true and correct record of the events he observed that day. Defense counsel objected, in relevant part, that the video was more prejudicial than probative and "may be inflammatory." The trial judge excused the jurors and reviewed State's Exhibit 528 outside their presence. The judge then concluded that the video corroborated Stastny's testimony, indicated that Hasse's death was not the result of improper medical care, corroborated testimony concerning Hasse's wounds, and was more probative than prejudicial. When the jurors returned to the courtroom, the judge warned them that the video was "not particularly graphic, but it is very dramatic." State's Exhibit 528 was then played for the jury.

The considerations for determining the admissibility of audiovisual recordings under Texas Rule of Evidence 403 are generally the same as those for determining the admissibility of photographs.[99] The admissibility of photographs is within the sound discretion of the trial judge.[100] "Rule 403 requires exclusion of evidence only when there exists a clear disparity

---

[99] *See, e.g.*, *Gordon v. State*, 784 S.W.2d 410, 411 (Tex. Crim. App. 1990) (quoting *Marras v. State*, 741 S.W.2d 395 (Tex. Crim. App. 1987) ("Motion pictures are just a collection of photographs and the rules surrounding admission are the same as those for still photographs.")).

[100] *Sonnier v. State*, 913 S.W.2d 511, 518-19 (Tex. Crim. App. 1995).

between the degree of prejudice of the offered evidence and its probative value."[101] When determining whether the danger of unfair prejudice substantially outweighs the probative value of photographs, we consider factors such as the number of photographs, their gruesomeness, their detail, their size, whether they are black and white or color, whether the body is naked or clothed, and whether the body has been altered by autopsy.[102] We also consider the availability of other means of proof and the circumstances unique to each individual case.[103] Photographs depicting matters described by admissible testimony are not rendered inadmissible merely because they are gruesome or might tend to arouse the passions of the jury, unless they are offered solely to inflame the minds of the jury.[104]

To account for the differences between still images and audiovisual recordings, we will consider the length of the video rather than the number of photographs.[105] Additionally, when the trial record reflects that the jury heard the audio portion of the recording, we will consider whether the audio tended to arouse the passions of the jury or was otherwise

---

[101] *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001); *see* TEX. R. EVID. 403.

[102] *See Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).

[103] *Sonnier*, 913 S.W.2d at 518.

[104] *Erazo*, 144 S.W.3d at 489-90.

[105] *Cf. Gordon*, 784 S.W.2d at 412 (considering the length of a video as a factor in assaying its admissibility); *see also Salazar v. State*, 90 S.W.3d 330, 332-33, 338 (Tex. Crim. App. 2002) (same).

inflammatory.[106]

In this case, the audiovisual recording was 11 minutes, 28 seconds long. The presentation of the punishment evidence lasted seven days. The dashboard camera recorded the view through the front windshield of the police car. The first part of the video silently depicted the route from the burglary scene to the murder scene as the police car backed out of a driveway and into the street and then drove past houses and buildings. The remainder of the video, accompanied by audio, depicted Stastny's arrival at the crime scene, his administration of CPR upon the victim, his efforts in ensuring that the victim was loaded properly into an ambulance, and his leaving the scene to search for the suspect.

As the trial judge concluded, this audiovisual recording was dramatic but not gruesome. Additionally, Williams "fails to specify in what respect he believes the tape was prejudicial."[107] Also, the recording depicted no more than the results of Williams's own conduct. "[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done[,] we cannot hold that the trial court has abused his discretion merely because it admitted the evidence."[108]

In addition, this recording "could have aided the jury in better understanding"

---

[106] *Cf. Salazar*, 90 S.W.3d at 339 (stating that emotional background music "greatly amplifie[d] the prejudicial effect" of an erroneously-admitted "memorial videotape" of the victim's life).

[107] *See Webb v. State*, 760 S.W.2d 263, 276 (Tex. Crim. App. 1988).

[108] *Sonnier*, 913 S.W.2d at 519.

Stastny's testimony concerning his own actions and the state of crime scene, as well as his testimony concerning Hasse's location and condition.[109]  It "provide[d] a framework within which the particulars of the State's evidence could be developed."[110]  The audio portion of the recording was not unduly emotional or inflammatory.  The voices on the recording generally remained level and calm.

Finally, this recording was offered at the punishment phase, when the State properly could present evidence demonstrating that Williams's victims were not faceless, fungible strangers, and that his conduct had foreseeable consequences to the community and to the victim's survivors.[111]  We conclude that the trial judge did not abuse his discretion by admitting State's Exhibit 528.  Point of error twenty-six is overruled.

*Victim Impact Evidence*

In point of error twenty-seven, Williams asserts, "The trial court erred in overruling [Williams's] objection to victim impact evidence of a victim not named in the indictment."  To support his claim, he then provides an excerpt of the trial record from the punishment phase.  In this excerpt, a witness identified State's Exhibit 50, a photograph of Hasse's body, over defense counsel's objection that "a murder victim not named in the indictment, while

---

[109]  *See Gordon*, 784 S.W.2d at 413; *see also Marras*, 741 S.W.2d at 404-05, *overruled on other grounds by Garrett v. State*, 851 S.W.2d 853, 860 (Tex. Crim. App. 1993).

[110]  *Webb*, 760 S.W.2d at 276.

[111]  *See Salazar*, 90 S.W.3d at 335 (citing *Payne v. Tennessee*, 501 U.S. 808, 838 (1991) (Souter, J., concurring)); *see also Estrada v. State*, 313 S.W.3d 274, 316 (Tex. Crim. App. 2010).

admissible under same transaction contextual evidence, evidence of good character activities or impact of, of that individual's death on the witness is not relevant."

On appeal, Williams contends that extraneous victim impact evidence is irrelevant in the context of the special issues under Article 37.071. He also argues that the witness's testimony constituted an impermissible "comparative worth" analysis. However, Williams failed to make a "comparative worth" argument at trial, and so we will not consider it on appeal.

The record reflects that the State called Officer Justin Lewis, who testified that he had worked as an investigator for the Kaufman County DA's office during Hasse's tenure as an assistant district attorney. He testified without objection that he and Hasse had become friends while Lewis was Hasse's investigator at the DA's office. Lewis affirmed that he spoke at Hasse's funeral. He identified State's Exhibit 2 as a photograph of Hasse "when he was alive." Lewis testified that Hasse "brought a lot of experience" and "a wealth of knowledge" to the Kaufman County DA's Office. Hasse had been a prosecutor in the Dallas County DA's Office for many years and was the head of the organized crime division before he accepted employment with the Kaufman County DA's Office. Lewis testified that many law enforcement officers and attorneys in Kaufman County relied on Hasse to answer their legal questions. Hasse was considered McLelland's "top assistant district attorney," and he was also a certified peace officer. Hasse usually carried a Glock pistol.

When the prosecutor asked Lewis if Hasse had a family, defense counsel objected

"under relevance." The prosecutor responded that he was trying to "flush [sic] out the victim in this case." The trial judge overruled the objection, but added, "not a lot of this." Lewis then testified that Hasse had a brother in Virginia and a mother in the Dallas area. Hasse, who was unmarried, had been close to his mother.

The prosecutor then inquired into Lewis's role in the investigations of the Hasse and McLelland murders. Lewis stated that he did not play "a major role" in those investigations. However, around 8:40 on the morning that Hasse was murdered, Lewis looked out of his window in the sheriff's office and saw two detectives running toward their vehicles. He called dispatch to find out what had happened and learned that there had been a shooting at the courthouse. Lewis then ran to his own vehicle and drove to the courthouse. Several officers and an ambulance were already on the scene when Lewis arrived, so he began searching the neighborhood for the suspect vehicle. While searching, he encountered a clerk from the DA's office and stopped briefly to speak with her. She informed Lewis that the shooting victim was Hasse and that he had died. When the prosecutor asked Lewis how the news affected him, Lewis responded that he was shocked and that it had "never occurred to me that it was -- ." Defense counsel interrupted, objecting to this testimony on grounds that it was not relevant and violated Texas Rule of Evidence 403. The judge overruled the objection. Defense counsel then added:

> Judge, may I, may I add an objection under, specifically under Cantu v --
> versus State, . . . ,[112] which says that a murder victim not named in the

---

[112] *Cantu v. State*, 939 S.W.2d 627, 630 (Tex. Crim. App. 1997).

indictment, while admissible under same transaction contextual evidence, evidence of good character activities or impact of, of that individual's death on the witness is not relevant.

The trial judge again overruled the objection. However, Lewis did not finish his interrupted answer, and the prosecutor did not continue this line of inquiry. Instead, the prosecutor showed Lewis a photograph of Hasse's body, which Lewis identified without further comment. The prosecutor offered the photograph as State's Exhibit 50 "for record only," and defense counsel stated that he had no objection "for record purposes only."

The prosecutor then asked Lewis to identify several aerial photographs and a "crime scene diagram" of the area where Hasse was murdered, and Lewis did so. Defense counsel stated that he had no objection to the admission of those photographs and the diagram. The prosecutor published one of the aerial photographs to the jury and Lewis testified concerning its contents. When the prosecutor passed the witness, defense counsel had no questions, and Lewis was excused.

On appeal, Williams directs us only to defense counsel's objection immediately before the prosecutor showed Lewis the photograph of Hasse's body. He does not contend that any other part of Lewis's testimony was inadmissible. To the extent that Williams intends to complain of any other part of Lewis's testimony, his point is inadequately briefed.

Furthermore, Article 37.071, section 2(a)(1), provides that, in the punishment phase of a capital trial in which the State seeks the death penalty, evidence may be presented by the State and the defendant as to any matter that the trial judge deems relevant to sentence.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[113] It is well established that the range and severity of a defendant's other criminal conduct is one type of evidence that is relevant to sentencing.[114] Such evidence is "clearly probative" of a defendant's future dangerousness.[115] Relevant extraneous-offense evidence may include, for example, the testimony of extraneous-offense victims concerning the circumstances of the extraneous offense and identifying the defendant as the perpetrator.[116] More specifically, it may include testimony concerning the extent of an extraneous-offense victim's injuries.[117]

In this case, the complained-of evidence was Lewis's unfinished answer to the question asking how the news of Hasse's murder affected him, and his identification of a photograph of Hasse's body. Even if we assume without deciding that the prosecutor's question and Lewis's answer were improper, we find no harm in Lewis's brief and

---

[113] TEX. R. EVID. 401; *see Mayes v. State*, 816 S.W.2d 79, 84 (Tex. Crim. App. 1991).

[114] *See Davis v. State*, 597 S.W.2d 358, 361 (Tex. Crim. App. 1980); *see also Paredes v. State*, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004).

[115] *See, e.g.*, *Young*, 283 S.W.3d at 877.

[116] *See, e.g.*, *Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991); *see also Roberts*, 220 S.W.3d at 531.

[117] *See, e.g.*, *Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (finding no inadmissible victim-impact evidence when the victim of an extraneous aggravated robbery testified about the defendant's brutal attack on a second victim during that robbery and the second victim's resulting injuries and mental impairment).

incomplete response. Other testimony concerning Hasse's character and the effects of his murder on others in the community had already been admitted into evidence without objection.[118] Further, as evidence of the range and severity of Williams's other criminal conduct, Lewis's identification of the photograph was evidence relevant to sentence. Point of error twenty-seven is overruled.

*Frank AuBuchon Testimony*

In point of error twenty-eight, Williams contends that the trial judge erred in overruling his objection during the State's punishment-phase cross-examination of the defense's expert witness, Frank AuBuchon, about the conduct of other inmates in the Texas prison system. Specifically, Williams argues that the State's questioning concerning the "Texas Seven" elicited irrelevant evidence. Williams also asserts that this testimony violated his Eighth Amendment right to an individualized punishment decision because this line of questioning effectively punished him for other inmates' misconduct.

In considering whether the trial judge's evidentiary ruling was in error, we do not view AuBuchon's testimony in a vacuum.[119] Instead, we view it in the context of the parties'

---

[118] *See Davis*, 329 S.W.3d at 823 (observing that error in the admission of evidence is cured where the same evidence comes in elsewhere without objection).

[119] *See, e.g.*, *Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999) (citing *Mosley v. State*, 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998), and stating that the jury is not, and should not be, required to look at mitigating evidence in a vacuum but instead may consider aggravating circumstances that are relevant to the mitigation special issue).

punishment phase arguments and evidence.[120]

The defense's position was that Williams would not be a future danger if he received a sentence of life in prison without the possibility of parole. In argument, defense counsel pointed to Williams's "age, his health conditions, and even his behavioral record in jail since his arrest." Counsel also asserted that Williams had already exacted the revenge he sought, and so he was no longer dangerous.

In support of this position, defense counsel called officials who interacted with Williams at the Kaufman County and Rockwall County jails and who escorted him to and from the courthouse and the courtroom. They generally affirmed that Williams was cooperative. On cross-examination, however, they also expressed concern that Williams was "very observant, and that he's watching every single thing that they do." Williams did and said things that indicated he was "testing the system to see exactly how it works." Authorities suspected that this "testing" included inducing medical episodes by manipulating his blood sugar levels.

Over defense counsel's "individualized sentencing" objection, the prosecutor cross-examined a Kaufman County jail administrator about another inmate's escape from the hospital where Williams had been taken after he passed out from low blood sugar. Defense

---

[120] *See, e.g.*, *Bowley v. State*, 310 S.W.3d 431, 435 (Tex. Crim. App. 2010) (stating that "a party who opens the door to otherwise inadmissible evidence risks the adverse consequences of having it admitted," and "[t]o hold otherwise would allow a party to create a favorable inference while depriving the other party of the truth-finding mechanism of cross-examination").

prison expert James Aiken described prison security measures and opined that, if Williams received a sentence of life without parole, he could be secured in a correctional environment so that he would not cause "undue harm" to others. On cross-examination, over defense counsel's "individualized sentencing" objection, the prosecutor elicited Aiken's testimony concerning several specific incidents in which inmates had escaped from prison, committed assaults and murders in prison, and orchestrated offenses outside of prison by secretly contacting their associates in the "free world." Aiken testified that some of these offenses were committed by prisoners who had not appeared to be dangerous or who had not been disciplinary problems before they committed violent acts.

Defense counsel then called prison expert Frank AuBuchon to testify concerning TDCJ's prison security and classification system. AuBuchon described the physical security measures in place in Texas prison facilities, as well as the five classification or custody levels applicable to inmates in the general prison population. He also described the intake procedure that every new inmate would undergo at a diagnostic unit before being assigned to a prison unit and given an initial custody level. An offender convicted of capital murder and sentenced to life without the possibility of parole would be assigned to the most restrictive type of prison facility and would likely have an initial custody level of three. Such an offender's custody level could become more restrictive than three if he behaved badly, but it could never become less restrictive than three. The offender would face housing and job restrictions throughout his incarceration.

AuBuchon testified that he had listened to the testimony of the officers who interacted with Williams at the Kaufman County and Rockwall County Jails. He had also reviewed Williams's jail records and records concerning the facts of the instant offense. Based on that information, AuBuchon opined that, if Williams were sentenced to life without the possibility of parole, he would probably be placed in the general population with a custody level of three. Williams's custody level would never be classified below three.

On cross-examination, and over defense counsel's repeated objection, AuBuchon affirmed the prosecutor's recitation of the details of a prison escape by the Texas Seven, a group of offenders who had been serving lengthy sentences at a maximum security prison unit. One of the inmates was a "capital life" inmate. Some of them were in their late 30's. Several worked in maintenance. None had major disciplinary records. They broke out of the prison after overpowering nine guards, several civilian employees, and some inmates. They tricked the guards at the gate tower into letting them inside, and they were able to take a revolver and other weapons and escape. They remained at large for 42 days. During that period, they committed multiple robberies and murdered a police officer. AuBuchon acknowledged that this incident demonstrated that some inmates could study the security system and identify and exploit its weaknesses. He also acknowledged that, although prison officials had made a number of security improvements after that incident, individual escapes continued to happen.

On redirect, AuBuchon testified that the total prison population was about 152,000

inmates, with about 70,000 people a year rotating in and out of prison. Despite some incidents of prison escapes and assaults, the classification system was still a useful tool for assigning an inmate's custody and affording appropriate security to control an inmate's behavior. AuBuchon acknowledged that he had worked with many attorneys, and he agreed with defense counsel's suggestion that being an attorney or a former attorney was "by no means a sign of intelligence." On recross, AuBuchon acknowledged that there had "probably" been about 180 murders in TDCJ since 1984.

Williams argues that the admission of AuBuchon's testimony about the "Texas Seven" violated the Eighth Amendment because it denied him an "individualized" sentencing determination. But the Eighth Amendment does not establish a special "federal code of evidence" governing "the admissibility of evidence at capital sentencing proceedings" to "supersede state evidentiary rules in capital sentencing proceedings."[121]

Rather, the Eighth Amendment requires the State to establish rational criteria that narrow the decision maker's judgment as to whether the circumstances of a particular defendant's case meet the threshold for imposing the death penalty.[122] The State "cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty."[123] In this respect, the State must allow the sentencer to consider any

---

[121] *Kansas v. Carr,* 136 S. Ct. 633, 644 (2016); *Romano v. Oklahoma,* 512 U. S. 1, 11-12 (1994).

[122] *Payne*, 501 U.S. at 824-25.

[123] *Id.*

relevant information offered by the defendant.[124]  But beyond these limitations, the Supreme Court has deferred to the State's choice of substantive factors relevant to the penalty determination.[125]

"Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . , the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment."[126]  Without more, the "mere admission of irrelevant and prejudicial evidence" does not constitute an Eighth Amendment violation that requires the reversal of a death sentence.[127]  In this case, the evidence at issue was relevant to rebut Williams's evidence and to test AuBuchon's opinion that prison security measures would ensure that Williams would not be a future danger. Williams's Eighth Amendment claim is without merit.

Point of error twenty-eight is overruled.

*Weapons Display*

In point of error twenty-nine, Williams asserts that the trial judge erred in overruling his objections to State's Exhibits 333 through 342, 344 through 415, 415b, 416, 416b, 531, 534, 535, and 566 through 570, admitted at the punishment phase.  He contends that "the number of weapons . . . display[ed] all at once to the jury was prejudicial . . . and gave undue

---

[124]  *Id.*

[125]  *California v. Ramos*, 463 U.S. 992, 1001 (1983).

[126]  *Id.* at 1008-09.

[127]  *Romano*, 512 U.S. at 11.

weight to the quantity of firearms seized that were not relevant as being used in the commission of the offenses presented." Williams argues that the display "impaired the presumption of innocence" and "was a comment on the evidence by the trial court" that violated his rights to due process and equal protection.

Outside the jury's presence, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Matthew Johnson testified at the punishment phase concerning the firearms and ammunition recovered from Unit 18. Specifically, the prosecutor stated, "in front of us we have numerous different firearms and ammunition and black powder weapons," and asked Johnson if he had recovered these items during his search of Unit 18. Johnson affirmed that he had, but clarified that two of the handguns in the display were recovered from Lake Tawakoni and one of the displayed handguns was recovered from Williams's house. The prosecutor noted that those three weapons were already in evidence. The prosecutor then offered the weapons and other items recovered from Unit 18 as State's Exhibits 333 through 342, 344 through 415, 415b, 416, 416b, 531, 534, and 535. Additionally, he offered three boxes containing ammunition that had been recovered from Unit 18 as State's Exhibits 566 through 568. He also offered, as State's Exhibits 569 and 570, two poster-sized photographs of the interior of Unit 18 after the Crown Victoria had been backed out of it but before its other contents had been moved.

Defense counsel objected, stating:

This display is horrendous. It is cumulative. The jury has seen all of the photographs of all the items recovered and seized in evidence throughout this

case. This display of, of items is wholly unnecessary, prejudicial in the extreme. This is not some type of drug raid we see in Mexico City. I think it's clearly designed for one purpose and one purpose only, to inflame the jury's sentiments to drive the decision on something other than the facts in this case. I object. I think that the, the -- several of these weapons, by the State's own expert's admissions, are clearly not connected to this case, are curios. It's -- Judge, it's fundamentally unfair under the 8th and 14th Amendments of the United States Constitution and the state cognates thereto. I feel somehow compelled that there's a 2nd Amendment argument in here somewhere, and I simply object.

The trial judge overruled defense counsel's objections, concluding that the exhibits were relevant to punishment and were more probative than prejudicial.

The jury then entered the courtroom, and Johnson identified a number of weapons for the jury. State's Exhibits 333 through 388, as well as 531, 534, 535, and 536, were a variety of handguns and long guns. Among them, Johnson identified five semi-automatic rifles, an "SKS" rifle with a bayonet, an "AR type rifle" with a flashlight and a dot-projecting scope, another rifle mounted on a tripod, and fourteen semi-automatic pistols. One of the semi-automatic pistols was equipped with a dot-projecting scope, flashlight, sling, and laser. Johnson identified thirty-six other firearms as shotguns, rifles, revolvers, and pistols.

Johnson also identified State's Exhibit 405 as a sheathed sword, Exhibit 406 as a sheathed machete, and Exhibit 407 as a crossbow with scope. He identified State's Exhibit 413 as a green backpack that contained State's Exhibit 414 (bolt cutters), Exhibit 407a (three crossbow bolts), and other items. Johnson did not expressly identify State's Exhibits 389 through 404, 415, 415b, 416, and 416b, although he affirmed that the display included several paint cans and six plastic ammunition boxes that had been recovered from Unit 18.

Williams directs us to a "visual image of the display," which he states is on post-trial Defense's Exhibit 8, a DVD containing an audiovisual recording of the court proceedings, between time counters 2:58 and 3:20. In fact, that image is on post-trial Defense's Exhibit 9, starting around time counter 1:06:46. The image reflects that the weapons were displayed on and around three wooden racks that sat on tables in the area between the counsel tables and the judge's bench. The distance from the floor to the top of the display was approximately the prosecutor's height. The two posters depicting the interior of Unit 18 were hanging on the wall behind the witness stand. Johnson testified that two of the wooden racks contained ten rifles each, while the third rack contained forty-two pistols. The green back pack was on one of the tables. The ammunition boxes, cans, and non-firearm weapons were on the floor.

The recording shows that Johnson removed and replaced each firearm as he identified it for the jury. Johnson also opened one box of ammunition for the jury's examination and showed its contents to the jury while identifying several types of ammunition. Additionally, he held up the machete, sword, and crossbow as he described them. He carried the green backpack from the display table to the witness stand before he opened it and showed its contents to the jury.

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice.[128] The rule favors the

---

[128] TEX. R. EVID. 403; *see Davis*, 329 S.W.3d at 806.

admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.[129] "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence."[130] The probability that a defendant will commit criminal acts of violence that would constitute a continuing threat to society is a "fact of consequence" at the punishment phase.[131]

"'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[132] All testimony and physical evidence are likely be prejudicial to one party or the other.[133] An analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.[134]

In this case, the weapons display was highly probative of Williams's future dangerousness. Although the jury had heard testimony concerning the discovery of these

---

[129] *Threadgill v. State*, 146 S.W.3d 654, 670-71 (Tex. Crim. App. 2004).

[130] *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

[131] Art. 37.071, § 2(b)(1); *see Davis*, 329 S.W.3d at 806.

[132] *Davis*, 329 S.W.3d at 806.

[133] *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

[134] *Jenkins*, 493 S.W.3d at 608.

weapons during the search of Unit 18 and had seen photographs of many of them, the trial judge was within his discretion in ruling that the display was not merely cumulative. The collective weapons display and the photographs of Unit 18's interior illustrated for the jury, in a way that previous testimony and photographs of the individual weapons had not, that Williams had assembled and secreted a well-organized and substantial arsenal in Unit 18, even though it was illegal for him to possess firearms.[135] These exhibits also conveyed to the jury that Unit 18 was Williams's secret "base of operations." The number and variety of the weapons, and their careful arrangement inside Unit 18, suggested that Williams anticipated using his "base" for future activities. Particularly when considered together with Kim's subsequent testimony that Williams had killed only two of the four people on his "hit list," this weapons display demonstrated that Williams's plans were not limited to the murders that he had already committed.

Certainly, the weapons display was prejudicial. However, it did not have a tendency to suggest a decision on an improper basis. The display accurately and effectively showed the jury the number, size, and variety of weapons that Williams, after murdering three people with various types of firearms, continued to possess in secret at the time of his arrest. Presenting the display did not take a tremendous amount of time; rather, presenting the weapons all together in one display was more efficient than presenting them serially. The State had already presented photographs of the weapons recovered from Unit 18 and so its

---

[135] *See* TEX. PENAL CODE § 46.04(a).

need for the display was, arguably, slight. Still, the trial judge could reasonably conclude that the display was not merely cumulative of the other weapons evidence. Thus, the trial judge acted within his discretion by overruling Williams's Texas Rule of Evidence 403 objection.

Although Williams did not expressly object at trial on the grounds of due process and equal protection that he now raises on appeal, he did object at trial that the weapons display was inflammatory and "fundamentally unfair under the 8th and 14th Amendments." We conclude that this objection preserved Williams's due process claim. Nevertheless, this claim is without merit for essentially the same reasons that Williams's Texas Rule of Evidence 403 claim is without merit. On the facts of this case, we fail to see anything fundamentally unfair about allowing the jury, at the punishment phase, to view the actual firearms and other weapons that Williams had amassed in his "base of operations" from which he had already committed three murders. Point of error twenty-nine is overruled.

In point of error thirty, Williams contends that the trial judge erred in denying his motion for mistrial "when the State presented to the jury a display of weapons[,] some of which were not in evidence." He relies on an event that occurred after Johnson testified before the jury concerning the weapons discussed in point of error twenty-nine. Specifically, the record reflects that, at some point during the defense's presentation of its punishment case-in-chief, the prosecutor discovered that some of the weapons in the display had no connection to Williams or to this case. Outside the jury's presence, the prosecutor stated that he intended to identify those weapons and withdraw them when the jury returned to the

courtroom. Defense counsel did not object to this procedure.

In the jury's presence, the prosecutor recalled Johnson to identify thirteen erroneously-admitted weapons and explain their provenance. The jury learned that State's Exhibits 334, 347, 357, 361, 363, 368, 369, 372, 374, 375, 376, 379, and 382 should not have been admitted into evidence because they were not linked to Williams or to this case. Specifically, Johnson identified these exhibits as: a pistol recovered from Hasse's home after his murder; a gun from the Seagoville Police Department evidence room that was not linked to this case; and several weapons from the Kaufman County District Attorney's office weapons inventory that were not linked to this case. The record reflects that Johnson had previously described these weapons as a semi-automatic rifle, a shotgun, four revolvers, six semi-automatic pistols, and a pistol.

Defense counsel then reiterated his prior objections to the weapons display. Counsel also moved for a mistrial, stating that the jury had already seen the display containing the erroneously-admitted weapons. The trial judge denied the motion for mistrial and withdrew the weapons from evidence. The prosecutor then elicited Johnson's testimony that, even after withdrawing the erroneously-admitted weapons, approximately fifty firearms were still linked to Williams.

After Johnson stepped down, the defense resumed its punishment case-in-chief. Later, in a hearing outside the jury's presence, defense counsel re-urged his objection that the weapons display was inflammatory and prejudicial under Texas Rule of Evidence 403(b),

and added that the display was irrelevant and fundamentally unfair. Counsel also asked the judge to instruct the jurors that they should not consider the withdrawn weapons during deliberations. The trial judge responded that the number of firearms in this case was "kind of like the ocean. There was maybe 65 weapons before. Now there's 40 something or whatever. So to me, I don't think the jury is going to see any appreciable difference between the two." The judge then agreed to give the jury an instruction to disregard the withdrawn weapons. After the jurors entered the courtroom, the judge provided them with that instruction.

For the reasons given in point of error twenty-nine, the trial judge did not err by denying Williams's motion for mistrial based on the weapons display. Given that "over 40 something" weapons were properly admitted, the trial judge's decision to deny a mistrial, after thirteen weapons were identified as improperly admitted, was within the zone of reasonable disagreement.[136] The trial judge's instruction to disregard the erroneously-admitted weapons was sufficient to cure any harm.[137] Point of error thirty is overruled.

_____

[136] *See, e.g.*, *Schutz v. State*, 63 S.W.3d 442, 446 (Tex. Crim. App. 2001) (concluding that the erroneous admission of evidence did not require reversal when the inadmissible evidence was "a small portion of a large amount of evidence" that the jury could have considered, so that this Court had a fair assurance that the error did not significantly affect the jury); *see also Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999) ("Generally, a mistrial is only required when the improper evidence is 'clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury.'").

[137] *See Hinojosa*, 4 S.W.3d at 253 ("[T]he jury is presumed to follow the trial court's motion to disregard improperly admitted evidence.").

## EXCLUSION OF EVIDENCE

### *2012 Trial*

In point of error thirty-one, Williams asserts that the trial judge erred in sustaining the State's objection to Defense's Exhibit 37. Williams asserts on appeal that he sought to present Defense's Exhibit 37, which was "other trial transcript testimony" of Williams's 2012 trial, after the State "opened the door" to this testimony by presenting Hasse's comments from that trial "in a State's Exhibit." However, Williams does not specify where in the record the State presented an exhibit that included Hasse's comments from the 2012 trial. This point of error is inadequately briefed.[138] Nor have we, in our independent review of the record, located such a State's Exhibit. Hence, the record does not support Williams's claim that the State "opened the door" to Defense's Exhibit 37 by presenting another part of the 2012 trial transcript that included Hasse's comments.

Williams also argues that the trial judge's exclusion of Defense's Exhibit 37 denied him a fair opportunity to present prior relationship evidence as provided by Article 38.36 and deprived him of an individualized sentencing determination as required by the Eighth Amendment. Defense counsel did not make these arguments at trial. Therefore, he failed to preserve error. Point of error thirty-one is overruled.

### *Harrison's Testimony*

In point of error thirty-two, Williams asserts that the trial judge erred in sustaining the

---

[138] *See Busby*, 253 S.W.3d at 673.

State's objection to the defense's proffered testimony of former District Attorney Rick Harrison. Williams describes the excluded testimony as "evidentiary circumstances that were relevant to the relationship of [Williams] to Mr. McLelland and Mark Hesse [sic]." He contends that the trial judge's ruling denied him a fair opportunity to present relationship evidence as provided by Article 38.36, and deprived him of the individualized sentencing determination required by the Eighth Amendment.

Just before Harrison testified, the prosecutor approached the bench and asserted that the State's team had had extensive contact with Harrison and believed that Harrison had "very limited personal knowledge about anything relevant in this case." Defense counsel responded:

> I believe Mr. Harrison will testify to some specific instances where he interacted with Mr. Williams concerning his campaign. I do believe those are relevant to the overall picture of Mr. Williams' life, development of the case for which he was tried for, and I think it's germane.

The prosecutor responded that the State had no objection to the defense's offer of proof, adding, "We just don't want it going into areas where this witness doesn't have personal knowledge about the burglary case or hearsay statements made by Mr. Hasse."

In the jury's presence, Harrison testified, in relevant part, that he was elected as the Kaufman County District Attorney in 2006 after defeating McLelland in a runoff election. During the campaign, Williams wrote a letter endorsing Harrison and critiquing McLelland that was published in a local newspaper as a political advertisement. Harrison acknowledged that Williams's letter was "paid for by the campaign."

Williams's letter was admitted as Defense's Exhibit 36, and Harrison read it aloud. When Harrison finished reading the letter, defense counsel attempted, over a multitude of sustained relevance objections, to ask Harrison about McLelland's various district-attorney campaigns, his track-record as a district attorney, and the like. Defense counsel made an oral offer of proof concerning Harrison's anticipated testimony in these matters.

Counsel asserted that, if Harrison had been allowed to testify freely: (1) Harrison would have testified that McLelland, even after he became the elected DA, continued to harbor a grudge against Harrison and his supporters, including Williams; (2) the defense "would have brought out the things that McLelland had highlighted as Mr. Harrison's weaknesses and the underlying facts that made that campaign so polarizing"; (3) Harrison would have talked about significant changes that he instituted in the DA's office and the changing political climate within the DA's office and Kaufman County; (4) Harrison would have testified that his friends and acquaintances abandoned him after his DWI conviction, and defense counsel would have drawn parallels between the abandonment Harrison experienced and the abandonment that Williams experienced after his 2012 convictions; (5) Harrison would have testified that such shifting allegiances are "the nature of Kaufman County," and that the "insular" character of Kaufman County contributed to Harrison's defeat during the second election; (6) Harrison would have testified that McLelland "was not the type of person to ever forget a grudge," and that Williams's letter during Harrison's first campaign "was absolutely not forgotten," as demonstrated by Defense's Exhibit 37, which

"specifically illustrated the fact that clearly Mike McLelland had not forgotten about the letter that [Williams] wrote in support of Rick Harrison"; and (7) Harrison would have further testified that, upon learning of the instant offenses, he immediately suspected Williams and informed law enforcement of his suspicion, and, as a personal friend of the prosecutors in this case, Harrison contacted the prosecutors and asked them to take this case and review the 2012 trial transcript.

On appeal, Williams asserts that Harrison's proffered testimony concerning Harrison's and McLelland's previous election campaigns for DA was relevant to show Williams's prior relationships with McLelland and Hasse. He argues that the trial judge's exclusion of this evidence violated Article 38.36 by depriving him of a fair opportunity to present evidence of these prior relationships. He further argues that this error denied the sentencer the opportunity to consider mitigating evidence, thereby frustrating Williams's Eighth Amendment right to an individualized sentencing determination.

Williams's assertion of multiple legal theories under a single point of error renders this point of error multifarious and inadequately briefed. Further, Williams did not expressly raise his Article 38.36 or Eighth Amendment grounds for admissibility at trial. Arguably, therefore, he failed to preserve error. We could reject Williams's arguments on these bases alone.[139] However, the context and language of some of counsel's questions to Harrison indicated that they were designed to elicit potentially mitigating prior relationship evidence

---

[139] *See Fuller*, 253 S.W.3d at 232 (stating that even constitutional error may be forfeited if the appellant failed to object at trial).

concerning Williams and McLelland. We will address this point of error only to the extent that the information sought, as indicated by the context and the questions asked, arguably comports with Williams's contentions on appeal.

Error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected, and the substance of the evidence was made known to the court by an offer of proof or was apparent from the context.[140] Under this standard, an oral proffer is generally sufficient to preserve error.[141]

However, an offer of proof that is made in the form of a statement by counsel "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible."[142] In this case, none of the items identified in defense counsel's offer of proof had any apparent relevance to Williams's prior relationship with Hasse, and therefore those items were not potentially mitigating evidence of Williams's motive for murdering Hasse. Further, only items (1), (6), and (7) arguably comport with Williams's contentions on appeal.

The remaining proffered items generally concern Harrison's election campaigns, his tenure as DA, and the political climate of Kaufman County. Defense counsel's offer of proof

---

[140] TEX. R. EVID. 103(a)(2); *see Mays*, 285 S.W.3d at 889.

[141] *See, e.g., Love v. State*, 861 S.W.2d 899, 901, 903 (Tex. Crim. App. 1993)*; Moosavi v. State*, 711 S.W.2d 53, 55 (Tex. Crim. App. 1986).

[142] *Mays*, 285 S.W.3d at 889-90 (quoting *Warner*, 969 S.W.2d at 2).

did not state the relevance that these items might have had to Williams's motive for murdering McLelland, or to Williams's own circumstances, and their relevance was not apparent. Therefore, the offer of proof failed to preserve error as to the exclusion of those items, and we need not address them on appeal.

Accordingly, we limit our review to the trial judge's exclusion of items (1), (6), and (7). Concerning item (1) (testimony that McLelland continued harboring a grudge against Harrison and his supporters), defense counsel asked Harrison whether McLelland's continued dislike of him extended to Harrison's friends and supporters, and the trial judge sustained the prosecutor's objection that counsel was asking Harrison "to speculate what a dead man thinks about other people."[143] On appeal, however, Williams does not challenge the trial judge's ruling on this objection. To the extent that Williams intends to make such a complaint, he has inadequately briefed it and we need not address it.

Defense counsel also asked Harrison if he had personal experience with McLelland antagonizing Harrison's supporters, and the trial judge sustained the prosecutor's relevance objection. Williams does complain on appeal about the trial judge's ruling on this objection. Therefore, we will review the trial judge's evidentiary ruling for an abuse of discretion.[144]

"Relevant evidence" is evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would

---

[143] *Cf. Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997) ("It is impossible for a witness to possess personal knowledge of what someone else is thinking.").

[144] *Jenkins*, 493 S.W.3d at 607.

be without the evidence.[145] Defense counsel did not specifically ask Harrison whether he had personal experience with McLelland antagonizing Williams. If he had, then the anticipated testimony might have been relevant. Instead, defense counsel generally asked whether Harrison had personal experience with McLelland antagonizing Harrison's supporters. The trial judge did not abuse his discretion by concluding that the answer to this question was not relevant. Further, because this inquiry did not relate to Williams's own circumstances, its exclusion did not undermine Williams's right to an individualized sentencing determination.[146] Thus, the trial judge did not abuse his discretion by sustaining the prosecutor's relevance objection to item (1).

Concerning item (6) (testimony that McLelland was not the type of person to forget a grudge, and he still remembered Williams's letter), defense counsel asked Harrison if he thought that McLelland ever "forgot about the letter," and the trial judge sustained the prosecutor's objection to "speculation and relevance." Williams does not argue on appeal

---

[145] *Ex parte Smith*, 309 S.W.3d 53, 56 & n.5 (Tex. Crim. App. 2010).

[146] *See Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."); *see also, e.g.*, *Joubert v. State*, 235 S.W.3d 729, 735 (Tex. Crim. App. 2007) (finding that the trial judge did not err by excluding evidence of a co-defendant's sentence because such evidence did not mitigate the defendant's culpability or relate to the defendant's character, his record, or the circumstances of the offense); *cf. Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Payne*, 501 U.S. at 822) ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances.").

that the trial judge erred by excluding this testimony on the ground of "speculation."[147] Williams's omission of any argument concerning "speculation" renders this complaint inadequately briefed, and we could sustain the trial judge's ruling on this basis, alone.

Nevertheless, our independent review of the record has revealed that the trial judge did not err by excluding this evidence as speculative. Rule 602 provides that a witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[148] If the proponent of lay-opinion testimony cannot establish personal knowledge, the trial judge should exclude the testimony.[149] In this case, defense counsel did not establish that Harrison had personal knowledge of whether McLelland had forgotten about Williams's letter. Therefore, the trial judge did not abuse his discretion by sustaining the prosecutor's objection to item (6) on the ground of "speculation." Having concluded that the trial judge properly excluded the evidence as speculative, we need not consider whether he properly excluded this evidence on the ground of relevance.

Concerning item (7) (testimony that Harrison immediately suspected Williams, informed law enforcement of his suspicions, and asked the prosecutor to review the 2012 trial transcript), defense counsel asked Harrison whether, upon learning of Hasse's murder, Harrison "immediately" suspected Williams. Defense counsel also made the statement,

---

[147] *See, e.g.*, *Jenkins*, 493 S.W.3d at 607 ("[I]f the trial court's decision was correct on any applicable theory of law, we will sustain it.").

[148] TEX. R. EVID. 602.

[149] *Fairow*, 943 S.W.2d at 898.

"When the McLellands were murdered, you personally informed the prosecutors that they should look at the theft transcript in this case." The trial judge sustained the prosecutor's relevance objections to both the question and the statement. Defense counsel proffered that, if the judge had not sustained the objections, Harrison would have testified that, upon learning of the murders, he immediately suspected Williams, and he asked the prosecutors to look at the trial transcript from Williams's 2012 theft case. It appears from this exchange that defense counsel sought to present the jury with Harrison's opinion that Williams was singularly motivated to commit the instant offenses and that the 2012 trial transcript would help illuminate Williams's motives

Even if we assume that the judge erred by excluding Harrison's proffered testimony in item (7), this exclusion was not harmful because the jury was already aware that Hasse and McLelland had successfully prosecuted Williams for burglary and theft in 2012, and that these convictions motivated Williams to commit the instant offense. During the examination of Williams's friend and fellow attorney Jenny Parks, Parks testified that she had personally watched the 2012 trial "every day." Defense counsel elicited Parks's testimony that the 2012 trial was "a ridiculous prosecution" and that Williams should "never have been brought to court for what they were saying that he did." Parks further expressed the opinion that Williams was wrongly convicted and that the evidence presented against him "wasn't factual." She stated that she thought the prosecution was "over the top."

Parks's testimony provided potentially mitigating evidence of Williams's motive that

was similar to, and more specific than, Harrison's proffered testimony. Parks's testimony that she did not immediately suspect Williams differed from Harrison's proffered testimony that he immediately suspected Williams, but we fail to see how excluding that part of Harrison's testimony could have harmed Williams. On the contrary, Harrison's proffered testimony would have informed the jury that, even before Williams had been publicly identified as a suspect, Harrison had believed that Williams was capable of committing these murders. To this extent, such information would not have been mitigating. Thus, even if the trial judge erred by excluding item (7), Williams was not harmed.[150] Point of error thirty-two is overruled.

*Graduation Video*

In point of error thirty-three, Williams asserts that the trial judge erred in sustaining the State's relevance objection to Defense's Exhibit 47, a video recording of Williams's high school graduation. Williams argues that he was denied due process and his right to a fair trial because this exhibit was mitigating evidence of his life and achievements before the 2012 trial. Williams contends that his strategy was to show that his conduct in committing the instant offenses was "an aberration in a long life of achievement," and that the triggers

---

[150] *Cf. Halprin v. State*, 170 S.W.3d 111, 116 (Tex. Crim. App. 2005) (concluding that any error in excluding a document containing mitigating evidence was harmless when the appellant "presented from other sources a significant amount of mitigating evidence that was cumulative of the mitigating evidence contained in the document"); *Hernandez*, 390 S.W.3d at 327 (Keller, P.J., concurring) (concluding that the trial judge erred by excluding relevant mitigating evidence, but, where similar mitigating evidence had been admitted and the aggravating evidence was substantial, the error was harmless).

behind his criminal conduct would not be present in prison. Williams complains that excluding this exhibit denied him the opportunity to present a complete case in mitigation and "to graphically show a more normal human side" of his life.

The record reflects that, during the testimony of Hugh "Brad" Pense, who had been Williams's close friend from childhood through high school, defense counsel presented Defendant's Exhibits 38 through 48. Except for Exhibit 47, these exhibits were photographs of Williams and his friends, taken during school-related and scouting activities. Defense counsel asked Pense whether "those pictures fairly and accurately show what appear to be shown in the photos." Pense responded affirmatively, and defense counsel offered them into evidence. Initially, all of these exhibits were admitted without objection. However, defense counsel then stated, "In that sequence there was a -- . . . video, your Honor, that's on DVD that I need to, . . . also include in that series as well." The prosecutor responded:

> [PROSECUTOR]: Frankly, I don't know how I can examine it right here at this moment in front of the jury. I think I'm entitled to examine the contents of the disk.
>
> THE COURT: What's the video about?
>
> [DEFENSE COUNSEL]: High school graduation, your Honor.
>
> THE COURT: Is there a relevance objection?
>
> [PROSECUTOR]: There is a relevance objection.
>
> THE COURT: Sustained.

The trial judge then admitted Defendant's Exhibits 38 through 48 "with the exception of 47."

We have reviewed Defense's Exhibit 47. It is a one-hour, fifty-eight-minute audiovisual recording that initially shows two events that do not appear to feature Williams at all. The video is grainy and blurred. Approximately one and one-half hours of the recording depict the graduation of the Azle High School Senior Class of 1985. Only about ten seconds of this recording feature Williams. Williams was first recognized during the scholarship announcements as "one of our top academic students in science and math" as well as the recipient of a full scholarship to Texas Christian University. Williams was recognized a second time during the distribution of the diplomas, when he received his diploma "cum laude."

Even assuming *arguendo* that the judge abused his discretion by excluding this recording, any error was harmless in light of the defense's presentation of an abundance of similar mitigating evidence. Williams presented testimony from his junior high and high school friends, as well as their parents. He also presented the testimony of his Boy Scout troop leader and a high school teacher who had sponsored Williams's interscholastic academic competitions. These witnesses recalled that Williams was friendly, helpful, hard working, well behaved, and intelligent.

Williams also introduced into evidence numerous photographs of himself as a baby, child, adolescent, teenager, and adult. These included individual portraits and class pictures; group photographs of Williams with his Boy Scout troop; candid photographs taken during scouting events and camping trips; a portrait of Williams in his high school or college

graduation robes; portraits of Williams with his date at formal dances; photographs of Williams with his high school friends; photographs of Williams at a summer job, together with time cards showing the hours he worked; a photograph of Williams, as a commissioned military officer, swearing into the Air Force his friend Pense, who had just completed ROTC; and photographs of Williams and Kim at their wedding. Almost all of these photographs depicted Williams facing the camera and smiling. Williams also introduced a photograph of a scouting medal he had received; a copy of an invitation to his Eagle Scout Court of Honor; and copies of newspaper reports of his Boy Scout troop's activities, his high school band's activities, and his high school academic team's competitions and awards.

Even without Defense's Exhibit 47, Williams presented abundant evidence of his "long life of achievement," particularly his activities and accomplishments through his high school years. Point of error thirty-three is overruled.

*Adams's Testimony*

In point of error thirty-four, Williams contends that the trial court erred in sustaining the State's relevance objection to a portion of the defense's proffered testimony of Cathy Adams. In his brief, Williams relies solely on the defense's written offer of proof which purports to describe Adams's excluded testimony. At trial, however, defense counsel also made an oral offer of proof in question-and-answer form during Adams's testimony. In addressing this point of error, we will consider the entire record pertaining to Adams's testimony.

As a prerequisite to presenting a complaint for appellate review, the trial record must show that: the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling sought with sufficient specificity, unless the grounds were apparent from the context, and complied with the rules of evidence or appellate procedure; and the trial court ruled on the request, objection, or motion, or, if the trial court refused to rule, the complaining party objected to the refusal.[151]  If an evidentiary ruling excludes evidence, a party may claim error only if the party informed the court of the substance of the evidence by an offer of proof, unless the substance was apparent from the context.[152]

In this case, the trial judge allowed Adams to testify to some of Williams's positive character traits, as well as some aspects of Kaufman County politics and Williams's 2012 prosecution.  Adams's testimony and defense counsel's oral offer of proof establish that the trial court excluded Adams's proffered testimony concerning: (1) the facts underlying her disbarment (sustaining the prosecutor's objection that these facts were not relevant); (2) Adams's opinion that Williams's 2012 prosecution was politically motivated (sustaining the prosecutor's objections that her testimony concerning the theft trial was speculative, irrelevant, and unduly prejudicial); (3) Adams's opinion that the 2012 trial was unfair

---

[151]  TEX. R. APP. P. 33.1(a).

[152]  TEX. R. EVID. 103(a)(2); see *Williams v. State*, 937 S.W.2d 479, 489 (Tex. Crim. App. 1996) ("To preserve error regarding the exclusion of evidence, an offer of proof is required.").

because "there were things that had the jury known might have made a difference in that case" (sustaining the prosecutor's objections that her testimony concerning the theft trial was speculative, irrelevant, unduly prejudicial, and a "strange comment from an attorney"); and (4) Hasse's comments to Adams referring to Williams as her "thief friend" (sustaining the prosecutor's objection that the testimony was hearsay and that there was no evidence that Williams was aware of those comments).

Concerning item (1), the trial judge did not abuse his discretion by concluding that the underlying facts of Adams's disbarment were irrelevant. It was not apparent, and defense counsel did not argue, that these facts involved Williams in any way. The judge could reasonably conclude that such evidence did not tend to make the existence of any fact that was of consequence to the determination of the action more or less probable than it would have been without the evidence.

Concerning item (2), the judge did not abuse his discretion by sustaining the prosecutor's objection that Adams's testimony was speculative, irrelevant, and unduly prejudicial. As proffered by the defense, Adams's testimony would have communicated only her opinion that Williams's 2012 arrest and prosecution were politically motivated, without any showing that Adams had personal knowledge of the matter or that her opinion was rationally based on her perception and helpful to determining a fact in issue. To the extent that Adams had personal knowledge of the matter in item (2), the trial court allowed her to testify. For example, Adams informed the jury that someone in the DA's office had posted

a "good size mugshot" of Williams with the word "captured" above it, and that displaying

a defendant's photograph in that manner was not typical behavior in the DA's office.

Concerning item (3), the trial court did not abuse its discretion by sustaining the

prosecutor's objection that Adams's testimony was speculative, irrelevant, and unduly

prejudicial. Adams testified that she was present during "quite a bit" of the 2012 trial.

However, the offer of proof revealed that Adams would have testified to her view that the

trial was unfair based on unspecified "things" that the jury in that case did not hear. Thus,

Adams's view was predicated on unspecified information that Adams had not acquired

through watching the 2012 trial. Moreover, defense counsel failed to inquire into the nature

of those "things" or the source of Adams's knowledge.

Concerning item (4), the trial judge did not abuse his discretion by sustaining the

prosecutor's objection that Hasse's comments to Adams were irrelevant because there was

no evidence that Williams was aware of them.[153] Further, to the extent that this testimony

was evidence that the 2012 prosecution was selective or overzealous, its exclusion was

harmless because it was cumulative of Adams's and Parks's similar testimony before the

jury.

An offer of proof "may consist of a concise statement by counsel, or it may be in

---

[153] *See Tennard*, 542 U.S. at 287 (stating that, at the punishment phase of a capital case, evidence is relevant in mitigation if it is of such a character that it might serve as a basis for a sentence less than death).

question-and-answer form."[154]  Here, defense counsel made offers of proof concerning

Adams's testimony in both forms.  After the parties rested, counsel submitted a written offer

of proof purporting to describe Adams's excluded testimony.  We will assume without

deciding that we may consider a written summary offer of proof even when counsel also

made an oral offer of proof in question-and-answer form.

However, the record in this case does not reflect that the trial court actually reviewed

and ruled on defense counsel's written summary offer of proof.  Defense counsel timely

presented the written offer after the parties had rested and before the court read the charge

to the jury.[155]  But in doing so, defense counsel stated:

> Prepared on the one for the following items for Cathy Adams.  There was a series of items that, that were excluded I think on relevance ground[s] that are set out -- that are set forth in our, our written offer of proof, and that's what we would ask the Court to do.  Bring her back in and allow her, you know, to say those things that, that we believe she would.  We think it would be -- that would be proper because we didn't think the relevance objection was proper; but of course, we just want to make the Court aware of what, what we think was excluded there.

The trial judge responded, "Okay, and it's part of the record, so I'll admit it for record

purposes."  Later, defense counsel again discussed this written offer of proof, stating that the

written offers of proof concerning excluded witnesses' testimony "should all be in front of

the Court now, and we'd ask the Court to rule on those offers before the, the jury is charged."

---

[154]  *Mays*, 285 S.W.3d at 889.

[155]  *See* TEX. R. EVID. 103(c) (stating that the court must allow the proponent to make an offer of proof "as soon as practicable—and before the court reads its charge to the jury").

The judge responded, "Okay. And the Court previously ruled and has concluded that that testimony would not be relevant, and I'm not permitting it."

This record reflects that defense counsel handed the judge the written offer of proof without explaining how the testimony described in it varied from the testimony that had actually been excluded at trial. Under the circumstances, the trial judge understandably expected the written offer of proof to reasonably and specifically summarize Adams's excluded testimony and the trial court's rulings. Accordingly, the judge accepted the written offer of proof "for record purposes" and reaffirmed his earlier rulings.

However, our review of the written offer of proof reveals that its contents are not consistent with Adams's testimony before the jury or her testimony during the oral offer of proof. In Williams's written offer of proof concerning Adams's testimony, he asserts that Adams would have testified that Williams was prosecuted in 2012 in retaliation for his political opposition to McLelland, and that Williams's conduct that was the subject of the 2012 prosecution—taking computer equipment from the county IT department—did not involve converting the equipment to his own personal use but instead involved moving that equipment to his office for the "benevolent purpose" of investigating "the feasibility of installing the equipment in his . . . courtroom as components of a video magistration system." Williams further contends in the offer of proof that Adams would have testified that the 2012 prosecution "was done in such a way that [Williams] would lose his law license upon any conviction for a crime of moral turpitude, such a[s] misdemeanor theft." Williams adds that

Adams would have testified that the 2012 prosecution was overzealous "and an abuse of prosecutorial discretion."

In contrast, during the oral offer of proof, Adams testified that Williams was prosecuted in 2012 because his election was "highly political" and "not everybody appreciated" the way he wanted to "move the department along." Further, defense counsel never asked Adams, in the offer of proof or in any other part of the trial, why Williams had taken the computer equipment that was the subject of the 2012 prosecution. Consequently, the State never objected to such questioning, and the trial court never ruled on the admissibility of this testimony.[156]

Similarly, defense counsel never attempted, either before the jury or in the oral offer of proof, to elicit Adams's testimony to the effect that even a misdemeanor theft conviction would have caused Williams to lose his law license. Accordingly, the trial court never ruled on the admissibility of such testimony.[157] In addition, Adams's alleged testimony as described in the written offer, concerning the vindictive and "overzealous" nature of the 2012 prosecution, did not comport with her testimony during the oral offer of proof, in which she stated that there were "things" that might have swayed the jury if they had been presented during the 2012 trial.

To the extent that the written offer of proof concerning Adams's testimony does not

---

[156] *See* TEX. R. APP. P. 33.1; TEX. R. EVID. 103.

[157] *Id.*

reasonably summarize the testimony that defense counsel offered and the trial court excluded, the written offer of proof did not preserve anything for appeal. We conclude that the trial court did not reversibly err by excluding Adams's testimony. Point of error thirty-four is overruled.

### Joneses' Testimony

In points of error thirty-five and thirty-six, Williams contends that the trial judge erred by sustaining the State's relevance objection to the defense's proffered testimony of sisters Andrea and Heather Jones. Williams relies solely on the defense's written offers of proof. However, the record reflects that, during Andrea's and Heather's testimony, the trial court did not exclude any evidence. The State made a relevance objection during Heather's testimony, but the trial court overruled it and allowed the testimony. Because the trial court's rulings did not exclude any of the sisters' testimony, we need not consider the written offers of proof. Points of error thirty-five and thirty-six are overruled.

### Calabria's Testimony

In point of error thirty-seven, Williams contends that the trial court erred in sustaining the State's relevance objection to the defense's proffered testimony of Mark Calabria. He again relies solely on the defense's written offer of proof. However, as with the written offer concerning Adams's testimony, the record does not reflect that the trial court actually ruled on the written offer concerning Calabria's testimony. Unlike Adams's testimony, defense counsel did not make an oral offer of proof in question-and-answer form. Thus, we will

consider the merits of this point of error, to the extent that the trial court's rulings during Calabria's testimony excluded evidence whose substance was apparent from the context and to the extent that the written proffer comports with the trial record.

Like Adams, Calabria was allowed to testify to Williams's positive character traits, his track record as a Justice of the Peace, and certain aspects of Kaufman County politics and his 2012 prosecution. Also like Adams, some of Calabria's expected testimony as to these latter points was excluded. From this record, we have identified several instances in which error was preserved because the substance of the excluded testimony was apparent from the context. The trial court excluded defense counsel's questions and Calabria's anticipated testimony in the following instances: (1) whether it was "natural" for cases involving politicians to be treated "differently" in Kaufman (sustaining the prosecutor's relevance objection); (2) whether, in Calabria's personal experience, "other county officials" had been "caught with their hand[s] in the cookie jar" (sustaining the prosecutor's relevance objection); (3) whether Calabria had any personal experience with "other county officials" being prosecuted "differently" (sustaining the prosecutor's objections to relevance, leading, and trying to get before the jury "what's improper"); (4) whether, if Calabria had been found guilty of theft, he would have been embarrassed (sustaining the prosecutor's relevance objection); and (5) whether Calabria thought "it would have made a difference if even one friend had reached out to" Williams following the 2012 conviction (sustaining the prosecutor's objections to speculation, relevance, and "continual leading").

The first three items appear to have been part of an effort to suggest that Williams's 2012 prosecution was selective and overzealous, thereby providing evidence of Williams's motive for committing the instant offenses. Even assuming *arguendo* that the trial court erred by excluding items (1) through (3) as irrelevant, defense counsel elicited substantially similar testimony from Parks, who testified that: She personally observed the 2012 trial; it was a "ridiculous prosecution"; Williams was wrongly convicted; and Williams "should never have been brought to court for what they were saying he did." Therefore, any arguable error in excluding Calabria's similar testimony was harmless.

Item (4) was arguably suggestive of Williams's motive. However, item (4) did not add any information about Williams's own circumstances. The jury had already received evidence that Hasse and McLelland had successfully prosecuted Williams for theft and burglary in 2012 and that, as a result, Williams had lost his livelihood and his status in the community. There was no dispute that Hasse's and McLelland's roles in obtaining these convictions constituted Williams's motive for committing the instant offenses. Whether another attorney would have been "embarrassed" by a theft conviction did not tend to make the existence of any fact that was of consequence to the determination of the action more or less probable than it would have been without the evidence.

Although the trial court sustained the State's objections to item (5) on multiple bases, Williams only challenges on appeal the trial court's ruling on the ground of relevance. Because Williams failed to adequately brief this argument, we could sustain the trial court's

ruling solely on this basis. In any event, defense counsel elicited substantially similar testimony when Calabria testified in front of the jury that everyone in the legal community knew Williams and that, in retrospect, he wished he had reached out to Williams and attempted to "make a difference" in the situation.

In the written offer of proof, Williams asserts that: (1) Calabria would have testified that the 2012 prosecution was in retaliation for Williams's political opposition to McLelland; (2) Williams did not convert the computer equipment for his own personal use but instead took it for the "benevolent purpose" of investigating "the feasibility of installing" it "as components of a video magistration system"; (3) Calabria would have testified that the 2012 prosecution "was done in such a way that [Williams] would lose his law license upon any conviction for a crime of moral turpitude, such a misdemeanor theft"; (4) the 2012 prosecution was overzealous and an "abuse of prosecutorial discretion"; (5) numerous Kaufman officials have taken advantage of county resources; (6) cases involving politicians in Kaufman, and particularly Ray Summero, are pursued more aggressively than cases against private citizens; (7) the "alleged 'threats'" Williams made against another attorney were "nothing more than hyperbole and . . . [the threatened attorney] himself did not take them seriously"; and (8) Williams "suffered social and professional isolation after the theft trial due to political pressures in Kaufman."

However, the record reflects that the only testimony set forth in the written offer of proof that was actually excluded at trial concerned whether: it was "natural" for prosecutions

of public officials to be handled differently from other prosecutions; Calabria was aware of other officials who were "caught with their hand[s] in the cookie jar"; and Calabria had any personal experience with "other county officials" being prosecuted "differently." Even assuming *arguendo* that this testimony was relevant, defense counsel elicited substantially similar testimony through Parks. We conclude that the trial court did not reversibly err by excluding Calabria's testimony. Point of error thirty-seven is overruled.

## JURY INSTRUCTIONS

In points of error thirty-eight and thirty-nine, Williams contends that the trial judge erred in denying his requested punishment-phase jury instructions and in overruling his objections to the punishment-phase jury charge. He asserts that defense counsel objected to the statutory charge that complied with Article 37.071 and requested that the instructions "be altered to provide definitions and in general greater specificity in the special issues for the jury."

Williams filed a pretrial motion that made sixteen objections to the punishment jury charge and thirty-three objections to the verdict forms. He also filed a motion to declare the "10-12 Rule" unconstitutional. At a pretrial hearing, the trial judge heard argument on the motion to declare the "10-12 Rule" unconstitutional. Defense counsel acknowledged that the law was settled against the defense, but stated that he wanted to preserve error for appellate review. The trial judge denied the motion. During the charge conference, the trial judge overruled Williams's requested punishment charge and his objections to the charge.

On appeal, Williams acknowledges that we have "previously overruled the issues raised in a same or similar context." He avers that he "seeks to preserve each sub-issue without waiver for any potential [f]ederal review of the issues in the future." Williams is correct that we have overruled similar claims.[158] He offers no argument or legal authority in support of these points of error, and we are not persuaded to reconsider our previous decisions. Points of error thirty-eight and thirty-nine are overruled.

We affirm the trial court's judgment and sentence.


Delivered: November 1, 2017
Do Not Publish

---

[158] *See, e.g.*, *Jenkins*, 493 S.W.3d at 613-18; *Saldano*, 232 S.W.3d at 104-09.